## ATTACHMENT B

## AFFIDAVIT IN SUPPORT OF ARREST WARRANTS

### INTRODUCTION

I, Vito D. Roselli, Special Agent of the Federal Bureau of Investigation, being duly sworn, depose and state that:

1.      I am a Special Agent of the Federal Bureau of Investigation ("FBI") assigned to the Philadelphia Division, South Jersey Violent Offender and Gang Task Force ("SJVOGTF") in Cherry Hill, New Jersey. Prior to being assigned to the SJVOGTF, I was assigned to the FBI Philadelphia Division Headquarters in Philadelphia, Pennsylvania. I have been a Special Agent with the FBI since May, 1997. As such, I am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516. Accordingly, I am an "investigative or law enforcement officer" within the meaning of Title 18, United States Code, Section 2510(7). I have received training in investigating violations of federal statutes from the FBI Academy located in Quantico, Virginia. Prior to this, I was an officer in the United States Coast Guard where I received extensive training in the maritime application of federal law enforcement.

2.      As an FBI Special Agent, I have also received specialized training in telecommunications exploitation. I have conducted physical and electronic surveillance, debriefed confidential human sources and participated in numerous arrests and in the

1

execution of search warrants. I have also been an affiant on search warrant applications. I have participated in numerous narcotics and gang investigations and debriefed or participated in the debriefings of numerous defendants, informants, and witnesses who had personal knowledge of narcotics trafficking and gang organizations. I have participated in all aspects of narcotics/gang investigations, including conducting surveillance, analyzing toll information obtained as a result of issued subpoenas, and analyzing information obtained from court-ordered pen registers, and trap and trace intercepts. I have also assisted in investigations involving the interception of wire communications, including the interception of wire communications related to this investigation. Based on my training and experience, I am familiar with the modus operandi of persons involved in the illicit distribution of Controlled Dangerous Substances ("CDS"), as well as the jargon and coded language utilized by traffickers of CDS, and in particular narcotics traffickers in and about the city of Camden, New Jersey.

3.     I am currently assigned to the investigation of two criminally associated Drug Trafficking Organizations ("DTOs"), hereinafter referred to as the Sheridan Street DTO and the RIVERA DTO. These DTOs are engaged in the distribution of powder cocaine and the manufacturing and distribution of crack cocaine. The Sheridan Street DTO is also engaged in the distribution of heroin.

4.     This Affidavit does not set forth each and every fact known by me or other law enforcement officers. I base the information set forth in this Affidavit upon personal

2

knowledge derived from my participation in this investigation and upon information I
believe to be reliable from the following sources:

a.  my training and experience investigating drug trafficking offenses;

b.  oral and written reports, and documents relating to this investigation that I have
    obtained and that I have received from members of the FBI and local law
    enforcement;

c.  discussions I have had personally concerning this investigation with
    experienced narcotics investigators;

d.  physical surveillance conducted by the FBI and local law enforcement
    agencies, the results of which have been reported to me either directly or
    indirectly;

e.  video pole camera electronic surveillance;

f.  public records;

g.  telephone toll records, pen register and trap and trace information, and
    telephone subscriber information;

h.  statements of reliable confidential sources,[1] confidential informants and
    confidential witnesses;

i.  court-authorized global positioning ("GPS") tracking warrants; and,

---

1 Confidential sources utilized during this investigation have been found reliable based upon information
provided by the source which has been independently corroborated by information learned during the
course of this investigation, other investigations or by other law enforcement agencies.

j. court-authorized interception of wire and electronic communications over the
telephones believed to be utilized by EFRAIM RIVERA, RAYMOND ROLDAN,
ANTHONY ESPRIT and JEROME ANTHONY RAMOS[2].

5. This Affidavit is submitted in support of a criminal complaint charging:

EFRAIM RIVERA, also known as ("aka") E ("EFRAIM RIVERA");

RAYMOND ROLDAN ("RAYMOND ROLDAN");

LUIS DIAZ, aka CANELO ("LUIS DIAZ");

ANGEL GARCIA, aka JUNGO ("GARCIA");

---

2 (a) On December 4, 2013, United States District Judge Noel L. Hillman, United States District
Court for the District of New Jersey, Camden, New Jersey, signed an order, Miscellaneous Number 13-
326 (NLH), authorizing the interception of wire and electronic communications occurring over the cellular
telephone facility assigned telephone number (310) 770-1808, utilized by EFRAIM RIVERA, for a period
of 30 days. The order expired on January 2, 2014.

(b) On January 2, 2014, Judge Hillman signed an order, Miscellaneous Number 13-326 (NLH),
authorizing the continued interception of wire and electronic communications occurring over the cellular
telephone facility assigned telephone number (310) 770-1808, utilized by EFRAIM RIVERA, for a period
of 30 days. The order expired on January 31, 2014.

(c) On January 16, 2014, Judge Hillman signed an order, Miscellaneous Number 14-01 (NLH),
authorizing the interception of wire and electronic communications occurring over the cellular telephone
facility assigned to (856) 308-1601, utilized by RAYMOND ROLDAN, for a period of 30 days. The order
expired on February 14, 2014.

(d) On February 3, 2014, Judge Hillman signed an order, Miscellaneous Number 13-326 (NLH),
authorizing the continued interception of wire and electronic communications occurring over the cellular
telephone facility assigned telephone number (310) 770-1808, utilized by EFRAIM RIVERA, for a period
of 30 days. The order expired on March 4, 2014.

(e) On February 20, 2014, Judge Hillman signed an order, Miscellaneous Number 14-04(NHL),
authorizing the interception of wire and electronic communications occurring over the cellular telephone
facility assigned telephone number (856) 831-5157, utilized by ANT RAMOS, for a period of 30 days.
The order expired on March 21, 2014.

(f) On February 28, 2014, Judge Hillman signed an order, Miscellaneous Number 14-05(NHL),
authorizing the interception of wire and electronic communications occurring over the cellular telephone
facility assigned cellular telephone number (856) 575-7119, utilized by ANTHONY ESPRIT, for a period of
30 days. The order expired on March 28, 2014.

4

ALI ALEXANDER, aka ALI AL ("ALEXANDER");

DANIEL ALSTON, aka BOO ("ALSTON");

GIOVANNY CARRERO ("CARRERO");

DYMIERE DEMBY ("DEMBY");

ANGEL VELEZ ("VELEZ"); and

DEWAYNE JACKSON ("JACKSON");

(hereinafter "the EFRAIM RIVERA DTO Conspiracy Target Subjects") with conspiracy

to distribute and to possess with intent to distribute: 280 grams or more of a mixture or

substance described in Title 21 U.S.C. Section 841(b)(1)(B)(ii)(II) containing cocaine

base, a Schedule II drug controlled substance, contrary to the provisions of Title 21,

United States Code, Sections 841(a)(1) and 841(b)(1)(A); and over 5 kilograms or more

of a mixture and substance containing a detectable amount of cocaine, a Schedule II

drug controlled substance, contrary to the provisions of Title 21, United States Code,

Sections 841(a)(1) and 841(b)(1)(A), in violation of Title 21, United States Code, Section

846 and Title 18, United States Code Section 2;

and :

RAYMOND ROLDAN ("RAYMOND ROLDAN");

DAISY ROLDAN ("DAISY ROLDAN");

ANTHONY ESPRIT, aka BOO BOO ("ESPRIT");

JEROME ANTHONY RAMOS, aka ANT RAMOS ("ANT RAMOS");

ALEXSIO RAMOS, aka AL RAMOS ("AL RAMOS");

5

GIOVANNY RAMOS, aka GIO ("GIO RAMOS");

RAMON DIAZ, aka PALUCO ("RAMON DIAZ");

LUIS DIAZ, aka "CANELO" ("LUIS DIAZ");

EFRAIM RIVERA, aka E ("EFRAIM RIVERA");

GRACIANO DIAZ, aka "ROCKY" ("ROCKY DIAZ");

JIMMY MERCADO, aka J.I. ("JIMMY MERCADO");

ERIC RIVERA ("ERIC RIVERA");

MARK WASHINGTON, aka BURGER, aka BG ("WASHINGTON"); and

CHRISTIAN SETZER, aka HITSTICK ("SETZER")

(hereinafter "the SHERIDAN STREET DTO Conspiracy Target Subjects")

with conspiracy to distribute and to possess with intent to distribute 280 grams or more of a mixture or substance described in Title 21 U.S.C. Section 841(b)(1)(B)(ii)(II) containing cocaine base, a Schedule II drug controlled substance, contrary to the provisions of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A) and 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II drug controlled substance, contrary to the provisions of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B) and a 100 grams or more of a mixture or substance containing a detectable amount of heroin, a Schedule I drug controlled substance, contrary to the provisions of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B), in violation of Title 21, United States Code, Section 846 and Title 18, United States Code Section 2.

6

The EFRAIM RIVERA DTO Conspiracy Target Subjects and the SHERIDAN STREET DTO Conspiracy Target Subjects will hereinafter collectively be referred to as "the Target Subjects."

6.    Because this Affidavit is being submitted for the limited purpose of establishing probable cause to support the application for criminal complaints and arrest warrants, I have set forth only the facts that I believe are necessary to establish probable cause to believe that the Target Subjects are in violation of Title 21, United States Code, Section 841(a)(1), knowingly and intentionally distributing and possessing with the intent to distribute cocaine base, cocaine and/or heroin; and Title 21, United States Code, Section 846, conspiracy to distribute cocaine base, cocaine and/or heroin; (hereinafter the "Target Offenses").

7.    This Affidavit will provide probable cause that the Target Subjects are part of the following conspiracies (the following does not list all conspirators, but only the conspirators addressed in this Affidavit):

### EFRAIM RIVERA DTO

Leader:          EFRAIM RIVERA

Suppliers:      UNIDICTED COCONSPIRATOR ("UCC1"); RAYMOND ROLDAN; M.C.; LUIS DIAZ

Facilitator:     J.M.

Customers/
Redistributors: GARCIA; B.F.; ALEXANDER; J.S.; VELEZ; M.R.; ALSTON; DEMBY; CARRERO; K.R.; JACKSON

7

**SHERIDAN STREET DTO (RAYMOND ROLDAN DTO and RAMOS DTO)**

Suppliers: D.S.; LUIS DIAZ; EFRAIM RIVERA

Facilitator: RAMON DIAZ

**RAYMOND ROLDAN DTO**

Leader: RAYMOND ROLDAN

Facilitators: DAISY ROLDAN; ESPRIT;

Set worker: SETZER; ROCKY DIAZ

Customers/
Redistributors: J.H.; R.C., M.M.

**RAMOS DTO**

Leader: ANT RAMOS

Facilitators: AL RAMOS; GIO RAMOS; JIMMY MERCADO

Set worker: SETZER; ROCKY DIAZ

Customers/
Redistributors: R.H.; WASHINGTON; ERIC RIVERA; T.N.

**SUMMARY OF THE INVESTIGATION**

8.     In December, 2011, the SJVOGTF and the New Jersey State Police conducted a joint investigation targeting individuals associated with drug distribution in Camden; specifically, on Sheridan Street in the Whitman Park and Pollacktown sections of Camden. This separate investigation will heretofore be referred to as the "Sheridan Street Investigation." During the Sheridan Street Investigation, law enforcement arrested approximately seventeen persons on state charges and confiscated over 5 kilograms of cocaine, over 50 grams of heroin, over $140,000 and 20 guns, including assault rifles. Among the individuals arrested during the Sheridan Street Investigation were ANT RAMOS, AL RAMOS, GIO RAMOS, JIMMY MERCADO, MARK WASHINGTON, and RAMON DIAZ. The above-listed individuals posted bail in the Sheridan Street Investigation, and the state charges against them remain pending at the time of the drafting of this Affidavit. It was through the Sheridan Street Investigation that law enforcement learned of a closely aligned criminal network, or "sister" network, with most of the conspirators and/or associates being related by blood.   Conspirators of this sister network included EFRAIM RIVERA, RAYMOND ROLDAN, J.M., DAISY ROLDAN, ESPRIT, and others. These individuals were identified by law enforcement sources and direct police contact.

9

9.     Starting in January 2013, a confidential source[3] ("CS") informed your affiant that EFRAIM RIVERA was engaged in the sale of cocaine in the Pollacktown/Whitman Park sections of Camden and that he was closely and criminally aligned with RAYMOND ROLDAN.  The ensuing investigation confirmed law enforcement's initial information regarding the ties between EFRAIM RIVERA, RAYMOND ROLDAN, and ANT RAMOS.  Additionally, reliable confidential sources advised law enforcement that most of the Target Subjects associated with Sheridan Street are blood relatives.  The relationships were corroborated through public records checks and direct interviews of some of the Target Subjects.  RAYMOND ROLDAN and DAISY ROLDAN are siblings.  ESPRIT is DAISY ROLDAN's son.  J. M. is RIVERA's live-in girlfriend and a niece to DAISY ROLDAN and RAYMOND ROLDAN. ANT RAMOS, GIO RAMOS, and AL RAMOS, aka "Al" are brothers and cousins to RAYMOND ROLDAN and DAISY ROLDAN.  RAMON DIAZ is a cousin of LUIS DIAZ.

10.     During the investigation the SJVOGTF utilized numerous techniques including, but not limited to, confidential sources of information, consensually-recorded conversations, controlled drug purchases, video "pole" camera surveillance, physical

---

[3] This FBI confidential source began providing information in November, 2012.  The CS was arrested in the State of New Jersey:  (1) in 1996 and was convicted of 3rd degree felony burglary; (2) in 2006 and was convicted of 3rd degree felony distribution of heroin/cocaine; and (3) in 2011 and was convicted of 3rd degree felony possession of CDS.  Information provided by the CS was routinely corroborated through other law enforcement sources, pen register analysis, physical surveillance and consensual recordings. The CS identified over ten subjects in a separate investigation.  Information provided by the CS has been proven reliable and was corroborated by information learned during the course of this separate investigation.  The CS received monetary payments from the FBI for information provided.  This CS has since engaged in criminal activity and is no longer providing information to the Government.

10

surveillance, court-authorized tracking warrants, and court-authorized interception of wire and electronic communications to identify members of the conspiracies and their activities as further detailed in this Affidavit.[4]

## QUANTITIES OF CDS SUPPLIED AND/OR DISTRIBUTED

## RIVERA DTO

11.    Law enforcement believes that the RIVERA DTO has been active since at least January 2013, when law enforcement first started targeting RIVERA.  However, for the purposes of this Affidavit, law enforcement made the following conclusions based on the investigation from the initiation of the court-authorized wire intercept of the RIVERA Phone on December 4, 2013 through the termination of interception on March 4, 2014. The figures are conservative and based on the monitoring of wire intercepts, physical and electronic (pole camera) surveillance, activation of GPS trackers on the RIVERA

---

4    Members of the named DTOs have been identified through multiple methods, including, but not limited to:  physical surveillance, video surveillance; monitoring of court-authorized intercepted wire communications, law enforcement and motor vehicle records, public databases, phone records and/or identification by law enforcement, Confidential Source ("CS") and Confidential Witness ("CW") information.  Additionally, the identities of callers associated with intercepted communications were established through the use of controlled purchases and surveillance conducted in conjunction with the monitoring of authorized interception of communications during the course of the investigation.

Chrysler 300 and the RAYMOND ROLDAN Durango, and controlled purchases. Law enforcement has determined that the RIVERA DTO has trafficked, at a minimum, 225 ounces of powder cocaine and 23.75 ounces of crack cocaine from December 4, 2013 through March 4, 2014.    At this time, law enforcement does not have conclusive evidence to indicate that the RIVERA DTO is engaged in heroin trafficking.

12.    **RIVERA DTO - POWDER COCAINE**:  Law enforcement utilized CW2 in executing five controlled purchases of powder cocaine from EFRAIM RIVERA: approximately 4.5 ounces on December 6, 2013; approximately 2.5 ounces on January 8, 2014; approximately 2.25 ounces on January 17, 2014; approximately 2 ounces on February 8, 2014; and approximately 2 ounces on February 22, 2014.  The total is approximately 13.5 ounces of powder cocaine.    As detailed below, law enforcement believes that UCC1 was RIVERA's primary supplier of powder cocaine.  Law enforcement identified a specific pattern whereby RIVERA took orders from customers, then called UCC1.  RIVERA typically ordered 4.5-ounce quantities of powder cocaine, using a code in which he referred to the 4.5-ounce quantities by street; for example, First Street meant 4.5 ounces, Second Street meant 9 ounces, and Third Street meant 13.5 ounces. Law enforcement deduced that RIVERA traveled at least 21 times to Philadelphia, where he met UCC1 and was supplied a total of least 198 ounces of powder cocaine. Also, as detailed below, RIVERA was supplied approximately 13.5 ounces of powder cocaine by M.C. on March 2, 2014.

12

13.    **RIVERA DTO - CRACK COCAINE**: Law enforcement believes that

RAYMOND ROLDAN normally supplied RIVERA with crack cocaine. As detailed

below, law enforcement believes that ROLDAN supplied RIVERA with 2.5 ounces of

crack cocaine on December 10, 2013, and at least 1.75 ounces on January 21, 2014.

RIVERA supplied several of his customers with crack cocaine. RIVERA supplied at

least 9.5 ounces of crack cocaine to GARCIA; at least six ounces of crack cocaine to

CARRERO; and at least four ounces of crack cocaine to VELEZ. The total between

what RIVERA was supplied by RAYMOND ROLDAN, and what RIVERA distributed, is

at least 23.75 ounces of crack cocaine. Law enforcement has only included the

amounts where the intercepted communications are descriptive enough for law

enforcement to conclude that the amount being distributed is crack cocaine. In a

number of the communications, while there is sufficient detail discussed to allow law

enforcement to determine that cocaine was being discussed, at this point, there is

insufficient detail for law enforcement to differentiate between powder and crack

cocaine.

## SHERIDAN STREET DTO

14.    CW4 is very familiar with the members of the Sheridan Street DTO. CW4

advised that RAYMOND ROLDAN and ANT RAMOS will supply distribution amounts of

CDS. CW4 did not know how much ROLDAN is supplied at a time, but did know that

ROLDAN sells multiple-ounce quantities of CDS to different individuals around Camden.

13

RAYMOND ROLDAN also has DAISY ROLDAN and ESPRIT distributing a total of at least two to three ounces of crack cocaine per day. Some of that is at the set at 1185 Sheridan Street, and some ESPRIT and DAISY ROLDAN deliver to other sets throughout Pollacktown. Several years ago, CW4 personally observed ANT RAMOS with multiple kilograms of cocaine at one time. CW4 explained that, more recently, the supply of cocaine to Camden has slowed down drastically; however, CW4 believes that RAMOS is now buying a minimum of 4.5 ounces of powder cocaine, up to a full kilogram ("brick") of powder cocaine at one time. CW4 did not know the frequency of RAMOS' supply. According to CW4, the RAMOS DTO then converts ("cooks") the powder cocaine into crack cocaine for redistribution. As mentioned elsewhere herein, as part of the prior Sheridan Street Investigation, ANT RAMOS, AL RAMOS, GIO RAMOS, and JIMMY MERCADO were arrested on October 3, 2012 inside of 1350 Sheridan Street. Recovered from 1350 Sheridan Street and ANT RAMOS' vehicle parked outside, were approximately 292 decks (a deck is also a single-dose bag) of heroin; approximately 3.5 ounces of crack cocaine; 2.5 ounces of powder cocaine which was recovered in ANT RAMOS' vehicle; and $6,221 in cash. Even though this was over two years ago, separate reliable FBI sources have all independently advised that even after this arrest and including to the present, the RAMOS DTO continued its drug trafficking activity. The current investigation corroborated CW4's information in this regard.

14

15.    CW4 also advised that ANT RAMOS is supplied at least 100 to 200 grams of heroin at a time, but CW4 did not know the frequency of RAMOS' supply.    CW4 estimated that the set at 1185 Sheridan Street was selling at least twenty bundles of heroin per day.    These amounts are consistent with law enforcement's experience with active drug sets in Camden and with specific knowledge of the drug set at 1185 Sheridan Street, and are most likely on the low side.  For example, late in the evening of December 24, 2013, AL RAMOS was arrested in the vicinity of 1185 Sheridan Street. According to police reports, AL RAMOS was detained along with H.L. on suspicion of engaging in drug distribution on Sheridan Street.  At the time, RAMOS was in possession of approximately $1,691 in cash.   H.L. was found to be in possession of three small clear bags containing blue wax paper stamped with "JUICY J" and $375 in cash.  Law enforcement believes that the money found on RAMOS and H.L., a total of $2,066, was from hand-to-hand sales at the open-air drug set at 1185 Sheridan Street. Additionally, the fact that H.L was found to be in possession of "JUICY J" heroin bags, the same brand ("stamp") purchased during this investigation during controlled purchases, indicates that they were in fact selling the heroin.  Law enforcement is aware that the drug set at 1185 Sheridan was selling ten-dollar bags of heroin.  In other words, it is believed RAMOS and/or H.L. participated in the sale of at least 206 bags of heroin prior to being arrested.  Law enforcement is aware that one gram of heroin will yield anywhere between 20 to 24 ten-dollar bags of heroin for street sale.  Therefore, law enforcement believes that the RAMOS DTO sold at least ten grams of heroin on or

15

about December 24, 2013.    This figure is a low estimate, especially if the DTO sold

bundles, as opposed to individual bags.  As detailed below, during the controlled

purchase on February 15, 2014, ANT RAMOS told CW4 that he was selling bundles of

fourteen bags for $90.  Law enforcement believes that these transactions were

conducted by the RAMOS DTO at the open air drug set at 1185 Sheridan Street, and

that the RAMOS DTO, to include AL RAMOS and H.L., sold approximately 23 bundles,

or 322 bags, or roughly sixteen grams of heroin on or about December 24, 2013.

16.    Law enforcement believes that the Sheridan Street DTO (RAYMOND

ROLDAN DTO and RAMOS DTO) conspiracy has been active since the initiation of the

aforementioned Sheridan Street Investigation, which began in December, 2011.

However, for the purposes of this Affidavit, law enforcement made the following

conclusions based on the investigation from the initiation of the court-authorized wire

intercept of the RIVERA Phone on December 4, 2013 through the last controlled

purchase on April 16, 2014.  The figures are conservative and based on the monitoring

of wire intercepts, physical and electronic (pole camera) surveillance, activation of GPS

trackers on the RIVERA Chrysler 300 and RAYMOND ROLDAN Durango, and

controlled purchases.  Law enforcement has determined that the RAYMOND ROLDAN

DTO was engaged in the trafficking of, at a minimum, 36 ounces of powder cocaine,

and sixteen 16 ounces of crack cocaine.  At this time, law enforcement does not have

conclusive evidence to indicate that the RAYMOND ROLDAN DTO is engaged in heroin

trafficking.  Law enforcement has determined that the RAMOS DTO was engaged in the

16

trafficking of, at a minimum, 27 ounces of powder cocaine,[5] 20.5 ounces of crack cocaine, and 325 grams of heroin, from December 4, 2013 through April 16, 2014.

17.    **ROLDAN DTO - POWDER COCAINE**:  As detailed below, the RAYMOND ROLDAN DTO was supplied powder cocaine by several individuals, to include D.S., EFRAIM RIVERA, and LUIS DIAZ.  Law enforcement believes that there were at least three meetings between RAYMOND ROLDAN and D.S., based on the intercepted communications and the observations of the pole cameras.  Based on the intercepted communications and the pole camera observations, law enforcement believes that D.S. supplied ROLDAN with a minimum of 4.5 ounces of powder cocaine on January 19, 2014.  Law enforcement believes that LUIS DIAZ supplied ROLDAN on at least three occasions.  For example, on January 21, 2014, there were a series of intercepted calls between RAYMOND ROLDAN and DAISY ROLDAN.  The details are provided later in the Affidavit; in summary, RAYMOND ROLDAN had DAISY ROLDAN coordinate a meeting with LUIS DIAZ.  DAISY ROLDAN called RAYMOND ROLDAN and said, "he said the same, or what?"  RAYMOND ROLDAN replied, "the same for now."  DAISY ROLDAN asked "what's that?"  RAYMOND ROLDAN replied "two."  Law

---

5    As detailed in this Affidavit, law enforcement believes that a portion, if not all of the 27 ounces of powder cocaine discussed above in paragraph 16 was manufactured, or "cooked" into crack cocaine by the RAMOS DTO and re-distributed.  On October 13, 2011, during the prior Sheridan Street Investigation, an undercover law enforcement officer ("UC") met with ANT RAMOS outside of 1350 Sheridan Street.  The UC told RAMOS that the UC was looking to buy "soft," meaning powder cocaine.  RAMOS replied that he did not sell powder cocaine.  RAMOS said, "I cook it up myself." Although this was almost three years ago, reliable FBI sources have since reported that RAMOS mostly sells crack cocaine.  Nothing in this investigation has indicated otherwise.

17

enforcement believes that RAYMOND ROLDAN asked DAISY ROLDAN to call LUIS DIAZ for a supply of cocaine. LUIS DIAZ wanted to know if RAYMOND ROLDAN wanted the "same." According to reliable FBI sources, RAYMOND ROLDAN is normally supplied multiple ounces and up to a kilogram of cocaine at a time. Based on law enforcement's past experience with ROLDAN and in analyzing the intercepts of both ROLDAN and RIVERA, law enforcement believes that ROLDAN's reference to "two" most likely means two quantities of cocaine, with each quantity being at least 4.5 ounces of cocaine, or nine ounces of powder cocaine. There have been instances in this investigation and detailed herein, where law enforcement believes, based on the captured intercepts between EFRAIM RIVERA and UCC1 and then RIVERA and ROLDAN, that RIVERA supplied ROLDAN with at least 4.5 ounces of powder cocaine. It is also law enforcement's experience that most drug distributors of ROLDAN's level normally do not deal in less than 4.5 ounces of cocaine. Therefore, law enforcement believes that when ROLDAN referred to the "same," and "two," he was most likely referring to a minimum of two 4.5 ounce quantities of cocaine. It is also evident to law enforcement that ROLDAN had been supplied the "same" amount, or a minimum of nine ounces of powder cocaine, by LUIS DIAZ on a previous occasion as well. On March 20, 2014, law enforcement intercepted a series of calls between RAYMOND ROLDAN, DAISY ROLDAN and ESPRIT, from which law enforcement concluded that RAYMOND ROLDAN was going to meet LUIS DIAZ by RAMON DIAZ' apartment. Surveillance units were dispatched and observed this meeting near RAMON DIAZ' apartment.

18

Again, it is believed that RAYMOND ROLDAN was supplied the "same," or nine ounces of powder cocaine. Law enforcement believes that RIVERA also supplied ROLDAN with at least 4.5 ounces of powder cocaine on at least one occasion. On February 5, 2014, based on intercepted communications between RIVERA and UCC1, law enforcement believes that UCC1 supplied RIVERA with four 4.5-ounce quantities of powder cocaine. RIVERA then arranged to meet with ROLDAN at 1225 Liberty Street, where law enforcement believes that RIVERA supplied ROLDAN with at least 4.5 ounces of powder cocaine.

18. **ROLDAN DTO – CRACK COCAINE:** As detailed below, there were three controlled purchases by CW4 of crack cocaine: On February 22, 2014, RAYMOND ROLDAN sold over three quarters of an ounce (over 21 grams) of suspected crack cocaine to CW4; and on March 1, 2014 ESPRIT supplied CW4 with approximately half an ounce (14 grams) of suspected crack cocaine, and did so again on March 4, 2014. Based on intercepted communications, and pole camera surveillance, and provided in greater detail later in the Affidavit, it was apparent that on February 5, 2014, EFRAIM RIVERA supplied RAYMOND ROLDAN with at least 4.5 ounces of powder cocaine, which ROLDAN in turn had cooked into crack cocaine inside 1350 Sheridan Street. After cooking the crack, ROLDAN called RIVERA to complain that the result was "ugly," meaning that ROLDAN was dissatisfied with the resulting crack cocaine, which he subsequently redistributed. Also, based on intercepted communications and pole camera observations, ROLDAN also supplied RIVERA with 2.5 ounces of crack cocaine

19

on December 10, 2013, which RIVERA in turn supplied to GARCIA. Based on intercepted communications between J.H. and ROLDAN on January 25, 2014, it was apparent that ROLDAN supplied J.H. with eight ounces of crack cocaine.

      19.   **RAMOS DTO - POWDER COCAINE**: As detailed below, the RAMOS DTO was supplied powder cocaine by several individuals, including but not limited to, D.S, EFRAIM RIVERA (via RAYMOND ROLDAN), CARRERO, and LUIS DIAZ. Law enforcement believes that there were at least five meetings between the RAMOS DTO and D.S., based on the intercepted communications and the observations of the pole cameras. However, at this point law enforcement can only positively conclude that D.S. supplied powder cocaine to the RAMOS DTO on January 19 and March 10, 2014. Based on law enforcement's experience with ANT RAMOS, along with the observations of CW4 and other reliable FBI sources, D.S. supplied RAMOS with a minimum of 4.5 ounces of powder cocaine for a total of at least nine ounces of powder cocaine. On March 13, 2014, RAMOS called CARRERO. CARRERO asked RAMOS, "How many cars do you want me to bring you?" RAMOS replied, "Two." As detailed later in this Affidavit, CARRERO refers to 4.5-ounce quantities as "bikes," or in this case, as "cars." CARRERO's minivan was later observed at 1185 Sheridan Street. Law enforcement believes that CARRERO supplied the RAMOS DTO with at least nine ounces of powder cocaine. There were at least two other occasions -- on February 5, and February 28, 2014, detailed below -- where law enforcement believes that RIVERA supplied RAMOS via ROLDAN with powder cocaine. Again, law enforcement believes that RIVERA

20

supplied at least 4.5 ounces of powder cocaine to RAMOS via ROLDAN on both occasions.

20.    **RAMOS DTO – CRACK COCAINE**:  During this investigation and detailed in this Affidavit, law enforcement bought a quarter-ounce (seven grams) of suspected crack cocaine from the RAMOS DTO, during a controlled purchase on February 15, 2014.  Additionally, several reliable FBI sources have reported that the RAMOS DTO distributes crack cocaine, and that the RAMOS DTO will use different locations for this purpose, including 1350 Sheridan Street and RAMON DIAZ' Apartment at 1550 Mount Ephraim Avenue.  This information was confirmed by the facts learned during this investigation.  For example, on March 8, 2014, R.H. called ANT RAMOS.  RAMOS told R.H. that he was "at my cousin house, I'm going hammer time," and "I'm at Paluc house."  RAMON DIAZ is known as "Paluco," or "Paluc."  While RAMOS was saying this, law enforcement monitoring the call could hear a distinctive sound consistent with someone breaking down a brick of cocaine or mixing one powder with another.  Law enforcement learned that "hammer time" is a reference to Arm & Hammer brand baking soda, an ingredient commonly used during the processing or cooking of powder cocaine into crack cocaine.  "Hammer time" is a term used by drug dealers to mean that it is time to manufacture crack cocaine.  As detailed below, RAMOS went to DIAZ' apartment on at least two other occasions, February 28 and March 20, 2014, and based on the intercepted communications, law enforcement believes that RAMOS went there to cook crack cocaine.  It is law enforcement's experience that an ounce of powder

21

cocaine may lose anywhere between two to seven grams of weight during the cooking

process, depending on the amount of impurities the original powder cocaine possessed.

As set forth in this Affidavit, law enforcement believes that the RAMOS DTO has

distributed a minimum of 20.56 ounces of crack cocaine from December 4, 2013

through April 16, 2014.[7]

21.     **RAMOS DTO - HEROIN:**  As detailed below, law enforcement believes

that the RAMOS DTO is supplied at least 100 grams of heroin at a time.  Law

enforcement believes that during this investigation, the RAMOS DTO received at least

three supplies of heroin.  For example, on March 3, 3014, based on the intercepted

communications detailed later in this Affidavit, law enforcement believes that ANT

RAMOS, AL RAMOS and JIMMY MERCADO were at the apartment of N.H., breaking

down and bagging heroin.  In the early morning hours of February 16, 2014, Camden

County Police Department-Metro executed a consent search of 1350 Sheridan Street in

conjunction with an unrelated shooting investigation.  During the search, police

recovered over 486 plastic bags of suspected heroin from the kitchen and $6,900 in

cash from the bedroom of L.R.  The bags of suspected heroin were stamped with the

word "Juicy XL."  In addition, and as detailed above, on December 24, 2013, AL

RAMOS was arrested in the vicinity of 1185 Sheridan Street and charged with

_____

7     27 ounces of powder cocaine, losing 7 grams per ounce, comes out to 20.25 ounces, plus the
      quarter-ounce of crack cocaine obtained during the controlled buy on February 15, 2014.

22

distribution of heroin.  On each of these occasions, that is on December 24, 2013,

February 16, 2014 and March 3, 2014, law enforcement believes that the RAMOS DTO

received at least 100 grams of heroin on or shortly prior to these dates.[8]  Additionally,

CW4 purchased a total of 25 grams of heroin from ANT RAMOS during two controlled

purchases on February 24 and March 4, 2014, detailed later in this Affidavit.

## RIVERA DTO

## LEADER:

## EFRAIM RIVERA, aka E

22.    As detailed further in this Affidavit, law enforcement initially learned that

RIVERA was being supplied cocaine by RAYMOND ROLDAN.  RIVERA was identified

early on in the prior Sheridan Street Investigation.  A National Crime Information Center

("NCIC") database search revealed that RIVERA has the following criminal history in the

state of New Jersey:

> i.    Arrested on October 10, 1999 by the Camden County

---

8    CW4, who is familiar with the heroin distribution of the RAMOS DTO, has stated that each shipment is at least 100 to 200 grams of heroin.  Another reliable FBI source has observed several of these shipments and described them as being a full sandwich bag in size.  Based on your affiant's experience, a full sandwich bag is at least 100 grams.  In addition, as detailed later in this Affidavit, on March 3, 2014, ANT RAMOS sent a text to R.H. that said, "Bro don't forget the mask," and then another text "Fa the dust."  Law enforcement believes that RAMOS was at 7721 Broad Street, Pennsauken, apartment D, which is associated with AL RAMOS, and that they were breaking down CDS.  Law enforcement further believes that they were most likely dealing with heroin, because the grinding and sifting process produces more dust than the cooking of powder cocaine.  The GPS phone data for the ANT RAMOS Phone indicated that ANT RAMOS was at 7721 Broad Street, Pennsauken, for over four hours.  This indicates that they were dealing with a significant amount of heroin.

23

Prosecutor's Office, and charged with possession/use of CDS; manufacturing/distributing CDS; and CDS on school property.   RIVERA was convicted of distribution/possession with the intent to distribute CDS on school property, a 3rd degree felony.  On July 11, 2000, he was sentenced to three years' confinement, being parole ineligible for ten months.

ii.    Arrested on December 9, 2003 by the Camden City Police Department, and charged with possession/use of CDS; manufacturing/distributing CDS; and distribution/possession with the intent to distribute CDS on school property. RIVERA was convicted of manufacturing/distributing CDS, a 3rd degree felony.  On March 4, 2005, he was sentenced to five years' confinement, being parole ineligible for two years.

iii.    Arrested on May 27, 2004, by the Camden City Police Department, and charged with possession/use of CDS; manufacturing/distributing CDS; distribution/possession with the intent to distribute CDS on school property; and possession/distribution of CDS within 500 feet of a public park.   RIVERA was convicted of conspiracy to manufacture/distribute CDS, a 3rd degree felony.  On March 4, 2005, he was sentenced to an aggregate of three years' confinement.

23.    Law enforcement learned that EFRAIM RIVERA was utilizing cellular telephone facility number (310) 770-1808 ("the RIVERA Phone"). As stated elsewhere in this Affidavit, law enforcement, utilizing cooperating witnesses, executed several controlled purchases of powder cocaine from RIVERA, totaling over 40 ounces.   The cooperating witnesses made arrangements for these controlled purchases by contacting the RIVERA Phone. The amounts of each controlled purchase varied from two ounces to nine ounces of alleged powder cocaine.   Law enforcement identified a distinct pattern of criminal activity that RIVERA adhered to and identified several members of

24

his distribution network, to include suppliers, customers who then redistributed the CDS, and facilitators.    RIVERA's customer base was spread throughout the city of Camden.

24.    In December, 2013, investigation revealed that RIVERA would regularly go to the intersection of East Letterly and Emerald Streets in Philadelphia to meet with his supplier, identified as UCC1.   Before proceeding to Philadelphia, RIVERA usually took orders from his Camden-based customers via the RIVERA Phone.   RIVERA's customers used different terms when referring to amounts, and whether they wanted powder cocaine or crack-cocaine.[9]  The terms most commonly used between RIVERA and his customers when requesting crack-cocaine were "hard," "dressed," or "done." Powder cocaine was often referred to as "naked" or "not done."

25.    For example, at approximately 6:31 p.m., on January 5, 2014, the RIVERA Phone received an incoming text from (267) 650-7635, a phone known to be utilized by ANGEL VELEZ ("the VELEZ Phone").   The text read, "Yo cuzz…need a size 7…done up".  Law enforcement believes that "size 7" refers to seven grams, or a quarter of an ounce.  The reference to "done up" indicates that VELEZ was requesting crack cocaine. According to law enforcement, the standard break-down of an ounce of cocaine (or crack cocaine) for sale in street-level narcotics distribution is in quarter-ounce increments and normally referred to in numbers of grams.  A quarter of an ounce of

---

[9]      The term "crack" cocaine, sometimes referred to as "hard," is a common street term used when referring to powder cocaine that has gone through a cooking process.   This process removes some of the substances that were added to the pure cocaine prior to resale, and converts the powder cocaine into a form which can be smoked.

cocaine is referred to as "7" (since there are 28 grams in an ounce, 7 grams equals a quarter of an ounce). A half of an ounce of cocaine is referred to as "14," and so on. RIVERA often used the terms "bike" or "motorcycle" when referring to a 4.5-ounce quantity of cocaine.

26.    At approximately 6:48 p.m., on February 17, 2014, RIVERA called cellular telephone facility number (856) 575-7080, a cellular phone number that law enforcement determined was being utilized by GIOVANNY CARRERO ("the CARRERO Phone"). CARRERO asked, "you working?" RIVERA replied, "No, I'm about to go to work right now, why?" CARRERO said, "I need, I need a motorcycle, brother…the one that costs four six." Based on law enforcement's experience, the comparable prices paid during the controlled purchases of 4.5 ounces of cocaine, and in context of other monitored conversations, law enforcement concluded that CARRERO was asking RIVERA for 4.5 ounces of cocaine. Based on the above, the cost of "four six" most likely refers to $4,600. Based on law enforcement's experience, $4,600 is a good price for 4.5 ounces of powder cocaine. During this investigation, law enforcement paid an average of about $1,100 per ounce of suspected powder cocaine, or $5,050 for a 4.5 ounce quantity of suspected cocaine. During one of the controlled purchases, law enforcement paid $4,600 for 4.5 ounces of suspected powder cocaine.

27.    After taking his customers' orders, RIVERA usually called UCC1. As previously stated in this Affidavit, when speaking with UCC1, RIVERA used the terms "First Street," "Second Street," "Third Street," and so forth, to indicate the amount of

26

cocaine he wanted.  Through the monitoring of intercepted communications over the RIVERA Phone, law enforcement deduced that each street number was code for 4.5 ounces of powder cocaine.  For example, on December 23, 2013, the RIVERA Phone sent the text message, "Second st" to cellular telephone facility number (215) 253-9666, a cellular phone number that law enforcement determined was being used by UCC1 ("the UCC1 Phone#1"[10]).  This meant that RIVERA was requesting nine ounces of cocaine from UCC1.  RIVERA then traveled to Philadelphia to obtain the requested amount of cocaine.  Based on the monitored communications and the controlled purchases of cocaine from RIVERA, the price for a 4.5-ounce quantity of powder cocaine ranged from at least $4,500 to $5,400.  Accordingly, ounce quantities varied between approximately $1,000 to $1,350.  During the investigation and based on the phone interceptions, it appeared that UCC1 sometimes fronted[11] the cocaine and then met with RIVERA after RIVERA sold the cocaine to his customers.  As far as law enforcement was able to determine, RIVERA always returned directly to Camden after being supplied by UCC1.

28.    The investigation revealed that RIVERA, utilizing the RIVERA Phone, arranged meeting locations with those customers who had placed orders.  On most

---

10    Based on interceptions during the investigation, law enforcement concluded that UCC1 changed his phone routinely.

11    "Fronting," or providing CDS with the expectation of later payment, is a common practice between a supplier and a trusted customer.

27

occasions, RIVERA met with his customers in front of his mother's residence at 1225
Liberty Street, Camden.    He sometimes lined up two or more customers at a time.  The
customers either pulled up in vehicles in the vicinity of 1225 Liberty Street, or parked
around the corner and walked up to the residence.  RIVERA sometimes entered the
passenger seat of the customer's vehicle to make the exchange, and on other
occasions, the customers entered the passenger seat of RIVERA's vehicle.    A pole
camera,[12] the Liberty Street pole camera, and physical surveillance were used to
monitor these meetings on Liberty Street.  Law enforcement observed that RIVERA
either entered 1225 Liberty Street, or walked down the driveway adjacent to the
residence into a red-colored detached shed in the back yard, or sat in his vehicle for
prolonged periods of time.  Law enforcement believes that RIVERA used this time to
break the cocaine down into the requested amounts.    The amounts RIVERA supplied
to customers varied from seven grams of crack cocaine to 13.5 ounces of powder
cocaine.  Law enforcement also believes that RIVERA supplied some customers with
"bundles"[13] of cocaine.    On other occasions, RIVERA packaged the cocaine on Liberty
Street and delivered the packages to his customers.    On occasion, RIVERA had

---

12    During the investigation, pole camera electronic surveillance remotely monitored activities at 1225
Liberty Street, 1160 Louis Street, 1350 Sheridan Street, 1355 Sheridan Street, and 1185 Sheridan Street.
These cameras will hereinafter be referred to respectively as "the Liberty Street pole camera,"  "the Louis
Street pole camera," "the 1300 Sheridan Street pole camera," and "the 1185 Sheridan Street pole
camera."

13    A "bundle" is a common street term used when referring to street-level amounts of CDS.  A
bundle will usually have anywhere from ten to fifteen small plastic bags of CDS, each bag containing
single use amounts of CDS.

28

customers meet him at his residence at 3069 Stevens Street or at the apartment of his cousin, GARCIA, at 337 Grand Avenue, Camden.   In the controlled purchases, RIVERA packaged the requested amounts of CDS in clear plastic sandwich bags.

29.     An example of RIVERA's modus operandi is apparent from the events of January 25, 2014.  A more detailed account of these events is provided later in this Affidavit.  In summary, on January 24, 2014, at approximately 1:06 p.m., the RIVERA Phone sent the text to (267) 979-2049, a phone known to be utilized by UCC1 ("the UCC1 Phone #2"), "K. Can u brin second st wit u."  As previously stated, based on the investigation, and my training and experience, it is believed that RIVERA utilized the term "second street" to refer to two 4.5-ounce quantities of cocaine (9 ounces total). The following day, RIVERA communicated with VELEZ, CARRERO, and a third customer.  The data from the GPS tracker applied to the RIVERA Chrysler 300[14] indicated that on January 25, 2014, at approximately 3:26 p.m., the RIVERA Chrysler 300 crossed the Ben Franklin Bridge into Philadelphia, Pennsylvania, drove to the vicinity of Front and Tioga Streets in Philadelphia, then crossed back over the Ben Franklin Bridge into Camden at approximately 4:53 p.m.  Based on the investigation, law enforcement believes that RIVERA went to Philadelphia, was supplied cocaine by UCC1, and then returned to Camden to supply his customers.   At approximately 5:01

---

[14]     The Court authorized the installation of a GPS tracking device on a black 2013 Chrysler 300, New Jersey registration ZZL-10K, registered to Gladys Rodriguez, 1225 Liberty Street, Camden, and operated by EFRAIM RIVERA ("the RIVERA Chrysler 300") during the course of this investigation.

p.m., the RIVERA Chrysler 300 was then captured on the Liberty Street pole camera parking in front of 1225 Liberty Street. RIVERA entered 1225 Liberty Street for a brief period of time, then came back out and re-entered his Chrysler 300. CARRERO then entered the RIVERA Chrysler 300 for approximately one minute. Law enforcement believes that an exchange was made in the RIVERA Chrysler 300. After this exchange, RIVERA was followed by law enforcement to the Ablett Village apartment complex. Law enforcement learned that VELEZ is associated with 290 Ablett Village. Law enforcement believes that RIVERA went to 290 Ablett Village to supply VELEZ Law enforcement intercepted RIVERA and the third unknown customer contacting each other by telephone and agreeing to meet the next day.

30.    J.M. is RIVERA's live-in girlfriend and his child's mother. RIVERA and J.M. reside at 3069 Stevens Street in Camden. As detailed later, J.M. was present in the car with RIVERA on at least three of the controlled purchases. During the last controlled purchase on February 22, 2014, J.M. drove RIVERA in her gray Tahoe ("the J.M. Tahoe"), New Jersey registration ZDD-57G, to the location of the sale.

31.    Law enforcement believes that UCC1 was supplying powder cocaine to RIVERA. The investigation revealed that RIVERA made at least three trips per week to Philadelphia to meet with UCC1. Law enforcement believes that RIVERA was obtaining at least nine ounces of cocaine on most of these trips. However, based on the investigation it became apparent that since December 2013, there were stretches of days where RIVERA could not reach UCC1 or UCC1 did not have a drug supply on-

30

hand to supply RIVERA. During these times, RIVERA went to other suppliers such as

RAYMOND ROLDAN, M.C., or LUIS DIAZ. The relationship between RAYMOND

ROLDAN and RIVERA appeared be interchangeable; that is, during the investigation,

RIVERA sometimes supplied RAYMOND ROLDAN with powder cocaine, and in turn,

RAYMOND ROLDAN supplied RIVERA with crack cocaine.

## CONTROLLED PURCHASES FROM RIVERA

32.    Law enforcement executed twelve controlled purchases from RIVERA,

recovering over 40 ounces of powder cocaine. Law enforcement utilized two

cooperating witnesses (hereinafter "CW1"[15] and "CW2"[16]) in executing these controlled

---

[15]    CW1 began providing information to the FBI in August 2012. CW1 was arrested in the State of New Jersey: (1) in 1990 and was convicted of 1st degree felony aggravated assault with a weapon; (2) in 1995 and was convicted of 1st degree robbery conspiracy and 2nd degree manufacturing/distributing CDS; (3) in 2001 and was convicted of 2nd degree manufacturing/distributing CDS; (4) in 2008 and convicted of 3rd degree conspiracy to distribute heroin/cocaine; and (5) arrested federally in 2011 in the District of New Jersey, and was convicted of tampering with a witness. Information provided by CW1 has been proven reliable. CW1 identified an interstate drug network, which initiated a separate FBI investigation and executed a consensually-recorded meeting corroborating CW1's allegations. CW1 also executed three consensual recordings and controlled purchases of CDS in the instant investigation. CW1 has not received monetary payments from the FBI for information provided. FBI agents involved in the investigation are unaware of any unauthorized criminal activity by CW1 during the course of the CW1's cooperation with the Government. CW1 is no longer being utilized by the Government.

[16]    CW2 began providing information to the FBI in April 2013. CW2 was arrested in the Commonwealth of Pennsylvania: (1) in October, 2001, and was convicted of misdemeanor carrying a firearm without a license; (2) in January, 2002, and was convicted of 3rd degree escape and 2nd degree aggravated assault; (3) in January, 2002, and was convicted of manufacturing/deliver, possession with

purchases. Both CWs were found to be reliable during the time they were utilized in this investigation. In all cases, following the controlled purchase of suspected cocaine, the suspected cocaine was field-tested by law enforcement and produced a positive reaction for cocaine. In all cases, the suspected cocaine was submitted to the Drug Enforcement Administration ("DEA") laboratory for analysis. DEA laboratory results for the first two controlled purchases from RIVERA, that is, approximately 4.5 ounces of cocaine on June 19, 2013, and approximately seven ounces on July 1, 2013, revealed that the substances purchased from RIVERA on those dates did in fact contain cocaine. The lab results are pending on the remaining submissions. During each controlled purchase, law enforcement provided the cooperating witnesses with the appropriate amount of currency, which was exchanged for the requested amount of cocaine. The cooperating witnesses and the vehicles they utilized were searched by law enforcement before and after each controlled purchase to ensure the integrity of the controlled purchase.

33.    During each controlled purchase, law enforcement provided the cooperating witnesses with recording devices. There was audio captured on each of

---

intent to distribute CDS; and (4) in October, 2007, in the Eastern District of Pennsylvania, was convicted of possession of a firearm by a convicted felon. CW2 also executed consensual recordings and controlled purchases of CDS in the instant investigation. CW2 has not received monetary payments from the FBI for information provided. FBI agents involved in the investigation are unaware of any unauthorized criminal activity by CW2 during the course of the CW2's cooperation with the Government.

32

the controlled purchases.  Clear video footage depicting RIVERA was captured during several of the controlled purchases.

34.      After each controlled purchase, the cooperating witnesses were debriefed. In each case, the recording equipment functioned properly and audio was successfully recorded, and a subsequent review of the recordings corroborated the cooperating witnesses' account of events.

## RIVERA DTO SUPPLIERS:

## UCC1, RAYMOND ROLDAN, LUIS DIAZ, M.C.

### UCC1:

35.      As detailed below, law enforcement believes that UCC1 was RIVERA's primary supplier of cocaine. Based on the cellular telephone analysis, monitoring of the court-authorized electronic and wire intercepts, and physical and electronic surveillance, law enforcement has determined that from December 5, 2013, to February 21, 2014, As previously stated, RIVERA traveled approximately 21 times to Philadelphia to meet with

UCC1. In total, law enforcement believes that, during this time, UCC1 supplied

RIVERA a total of at least 198 ounces of powder cocaine and had over 568 contacts[17]

with RIVERA. During the course of the investigation, UCC1 changed his cellular

telephone number frequently. Based on your affiant's training and experience, this

activity is also indicative of an individual engaged in trafficking of CDS. The phones

utilized by UCC1 were identified as:

> a. (215) 253-9666, from December 5 through December 26, 2013 ("UCC1 Phone #1");
>
> b. (267) 979-2049, from December 28, 2013 through January 28, 2014 ("UCC1 Phone #2");
>
> c. (267) 230-8916, from January 29 through February 8, 2014 ("UCC1 Phone #3"); and
>
> d. (267) 325-4690, from February 8 through February 21, 2014 ("UCC1 Phone #4").

36. On December 10, 2013, law enforcement monitored a series of calls and

texts between the RIVERA Phone and the UCC1 Phone #1. At approximately 4:15

p.m., the RIVERA Phone called the UCC1 Phone #1. RIVERA said, "Motherfucker, I

need second street of what I got. Know what I mean?" Law enforcement concluded

that RIVERA had just placed an order with his Philadelphia supplier. At the time,

RIVERA was driving a rented silver 2012 silver Toyota RAV4, Maryland registration

---

17    "Contacts" are all incoming and outgoing calls and texts, including unanswered calls and calls
routed to voice mail.

5AP9160. Law enforcement units surveilled RIVERA from Camden. Ultimately, surveillance observed the RAV4 park on East Letterly Street, near Jasper Street in Philadelphia. Approximately one minute after parking, a black BMW sedan, with Pennsylvania registration HWG3077, drove up East Letterly Street and parked directly across from RIVERA's rental vehicle. A dark-skinned Hispanic or black male was observed exiting the BMW and entering the passenger seat of RIVERA's rental. After a brief period, the male exited the rental and returned to the BMW. RIVERA departed shortly thereafter. At that time, surveillance was too far away to identify the driver of the BMW. An inquiry with the Pennsylvania Bureau of Motor Vehicles determined that Pennsylvania registration HWG3077 was registered to On December 16, 2014, law enforcement again monitored a series of calls between RIVERA and his Philadelphia supplier. Law enforcement units set up surveillance in the same area of East Letterly and Jasper Streets. This time, RIVERA traveled to Philadelphia in the RIVERA Chrysler 300. Surveillance observed the RIVERA Chrysler 300 park in the same place as on December 10, 2013. A white Chevrolet Suburban with Pennsylvania registration JGB7186, pulled up almost immediately afterward and parked directly across from RIVERA. Law enforcement observed the same individual as observed on December 10, 2013 exit the driver's door of the Suburban and enter the passenger seat of the RIVERA Chrysler 300.

37.    The following are some examples illustrating the supplier relationship between RIVERA and UCC1:

35

## Events of December 7, 2013

38.     On December 7, 2013, at approximately 9:50 a.m., RIVERA received a call from telephone facility number (702) 245-0676 ("the DEMBY Phone #1") and spoke with a male identified in this Affidavit as DEMBY.  DEMBY asked, "Yo bro, what's the deal?"  RIVERA replied, "Shit dude, woke up about twenty minutes, so my nigga, I'll be ready for you."  At approximately 10:02 a.m., RIVERA called UCC1.  UCC1 said, "I gotta meet up with them in a few, so I'll let you know."  There were a series of calls and texts between RIVERA and DEMBY in which DEMBY asked how long it was going to be.  At approximately 12:14 p.m., UCC1 called RIVERA. RIVERA said, "Tell me some good news, my nigga."  UCC1 replied, "I got some news, but I didn't get it yet."  RIVERA asked, "For sure, you know how long, because my man been waiting like and I don't want to keep stalling, you know like that day, that man, you know, your boy had me."  UCC1 said it would most likely be after 3:00 p.m.  At approximately 4:06 p.m., the UCC1 Phone #1 sent the RIVERA Phone the text, "We good."  At approximately 4:21 p.m., the UCC1 Phone #1 sent the RIVERA Phone the text, "How many."  The RIVERA Phone sent the reply, "2nd."  Almost immediately after this text, RIVERA called DEMBY. RIVERA asked, "what you was trying to do?"  DEMBY replied, "Two."  At approximately 4:32 p.m., the DEMBY Phone sent the RIVERA Phone the text, "3."  Almost immediately after this text, RIVERA called UCC1.  RIVERA said, "Yo, my people said make it Third Street instead."  Shortly after this call, law enforcement surveillance attempted to maintain surveillance of the RIVERA Chrysler 300 but lost the vehicle in the vicinity of

36

Front and Emerald streets in Philadelphia. Based on this investigation and the amounts referred to by RIVERA when ordering cocaine from UCC1, law enforcement believes that RIVERA went to Philadelphia and was supplied three 4.5-ounce quantities of powder cocaine (a total of 13.5 ounces), then returned to Camden.

39.     At approximately 5:12 p.m., the Liberty Street pole camera captured the RIVERA Chrysler 300 return and park at 1225 Liberty Street. At approximately 5:18 p.m., RIVERA called DEMBY and said, "I'm here, bro." At approximately 5:27 p.m., DEMBY called RIVERA. RIVERA said, "I'm coming outside now." A few seconds later, a Sport Utility Vehicle ("SUV") arrived on Liberty Street and parked directly across from 1225 Liberty Street. Law enforcement surveillance observed a male figure believed to be RIVERA exit 1225 Liberty Street and walk to the SUV. Approximately two minutes later, RIVERA walked back across the street and the SUV departed. Law enforcement believes that RIVERA returned to 1225 Liberty Street after UCC1 supplied him with cocaine, and thereafter had DEMBY meet him in the area of 1225 Liberty Street. RIVERA then supplied DEMBY with the "3," or 13.5 ounces of powder cocaine.

40.     At approximately 6:04 p.m., DEMBY called RIVERA. DEMBY said, "Shit, I just ate one of them sandwiches, man, that shit was kinda light." RIVERA asked, "Kinda light? Like, what was it looking like?" DEMBY replied, "Like, like, 102." RIVERA said, "Wooo, are you sure they doin' it right, homey?" DEMBY replied, "Yeah, I want to do that shit right in front of you, so you can, know what I mean, know what's going on." Law enforcement believes that DEMBY used the code word "sandwiches" to describe

37

4.5-ounce quantities of powder cocaine, which were "cooked" or processed into crack cocaine. DEMBY explained to RIVERA that during the cooking process the cocaine lost approximately 24 grams in net weight.[18] Moreover, I am aware that there are generally 126 grams in 4.5 ounces of cocaine.

41.     At approximately 6:13 p.m., RIVERA called UCC1. RIVERA asked, "I got a question bro, did they check that before they motherfucking gave it to you?" UCC1 said, "Nah, I just grabbed it, got it, you know what I mean." RIVERA said, "'Cause my man's, they don't never give me complaints, and he just called me back." Law enforcement believes that RIVERA called UCC1 to complain that his regular customer was not satisfied.

### Events of January 26, 2014

42.     On January 26, 2014, at approximately 12:59 p.m., the RIVERA Phone sent the UCC1 Phone#2 the text, "Can u get second for me." At approximately 1:34 p.m., the UCC1 Phone#2 sent the response, "Im calln 4u." At approximately 1:24 p.m., CARRERO called RIVERA. CARRERO said, "Yo. I am going to need one of those, you hear?" RIVERA replied, "Alright. I'm waiting...I'm w-waiting for the guy to bring it to me now." Law enforcement believes that when CARRERO said "...I am going to need

---

[18]     Powder cocaine is often "cooked" into crack cocaine. "Cooking" refers to the process of transforming powder cocaine into "crack cocaine," a form of cocaine which can be smoked. In layman's terms, powder cocaine is heated up or "cooked" to separate the impurities or "cut" that distributors commonly add to a kilogram of cocaine (commonly referred to as a "brick") to stretch out their supply. There is usually some loss of net weight from powder to the final harder product, or "crack" cocaine. In this situation, DEMBY is complaining that it lost too much, meaning the cocaine had too much "cut" in it.

one of those…," he was referring to one of the 4.5 ounce quantities that RIVERA was planning to get from UCC1. As detailed in this Affidavit, law enforcement has learned through the investigation that RIVERA is typically supplied in 4.5-ounce quantities of cocaine and that RIVERA has supplied CARRERO with 4.5 ounce quantities of cocaine. RIVERA then told CARRERO that he was waiting, meaning that he was waiting for his supply of cocaine from UCC1. At approximately 2:25 p.m., UCC1 called RIVERA. UCC1 said, "Yo, if you want, you can meet me at the garage." RIVERA replied, "Alright then I'm a head up there now." The call ended shortly thereafter.

43. At approximately 2:38 p.m., the RIVERA Phone sent the text to the CARRERO Phone, "He cumin I need 4650." The CARRERO Phone sent the response, "can I get something." The RIVERA Phone sent the text, "50 the price goin up." At approximately 2:42 p.m., CARRERO called RIVERA. CARRERO said, "Uh, I'm going over there right now, yo. I talked to the guy. He said it was fine. They need it, so . . ." RIVERA said, "Yeah, 'cause, I mean, there's, right now I'm going to keep a hundred. All of this is going up right now so be prepared, for your guys that you're dealing with, they'll tell you the same thing." CARRERO asked, "That, what happened?" RIVERA said, "No, that, prices are going up." CARRERO replied, "Yes, I know. I already told all of them, so. . ." CARRERO asked, "How much do you want me to give you?" RIVERA replied, "Then, pay me 46 now."

44. At approximately 2:49 p.m., UCC1 called RIVERA. UCC1 said, "Yo my nigga, I had to muscle I had to muscle my jawn. I got them. I got both of them for you,

39

you hear." RIVERA responded, "My nigga. I'm on the way over there right now."

UCC1 said, "Alright, alright, I'm going to wait for you next to the jawn." The data from

the GPS tracker on the RIVERA Chrysler 300 indicated that the RIVERA Chrysler 300

crossed the Ben Franklin Bridge into Philadelphia, drove to the vicinity of Front and

Girard Streets, and returned. It is law enforcement's belief that UCC1 supplied

RIVERA with at least nine ounces of cocaine based on the statement from UCC1 that

he had both of them, meaning two 4.5-ounce quantities.

45. At approximately 3:30 p.m.,UCC1 called RIVERA and complained, "Yo my

nigga I was, this jawn, it's 50 dollars short ya hear." RIVERA replied, "It's short?" UCC1

said, "50 dollars short. There's 2250 here."[19] RIVERA said, "Oh, I got you. I'll put it on

another one so it's going to be straight with the other one." UCC1 replied, "Alright."

46. At approximately 3:32 p.m., RIVERA called CARRERO, and said, "Yo. In

ten minutes, go to my mom's house." At approximately 4:05 p.m., the CARRERO

Phone called the EFRAIM RIVERA Phone. RIVERA answered, "I'm here on the

corner." CARRERO asked, "Where, bastard?" RIVERA replied, "You're in the middle of

the street right there?" CARRERO replied, "Yeah, yeah." RIVERA said, "That's me

coming down the street." At this time, the Liberty Street pole camera captured a male in

---

19    The investigation has not determined how much RIVERA pays UCC1 for each 4.5-ounce
quantity. However, based on your affiant's knowledge of common drug dealing practices, a drug
dealer will front a portion, if not all, of a supply of cocaine to a steady and reliable customer. Law
enforcement believes that the investigation has determined that RIVERA was a reliable and steady
customer of UCC1. Assuming that RIVERA was supposed to give UCC1 $2,300 ($2,250 plus the
$50 shortage), law enforcement believes that this was for a portion of the nine ounces, or may have
been what RIVERA still owed from a previous supply of cocaine.

40

a brown or neutral-colored hooded sweatshirt walking down Liberty Street as the RIVERA Chrysler 300 pulled up to 1225 Liberty Street. This figure entered the passenger door of the RIVERA Chrysler 300. Law enforcement concluded that this figure was CARRERO. CARRERO exited RIVERA's car a minute later and walked back up Liberty Street out of view.

47. At approximately 4:38 p.m., the CARRERO phone sent a text to the EFRAIM RIVERA Phone, which read, "missing 4gr." At approximately 4:39 p.m., the CARRERO Phone followed up with another text, "121gr." Law enforcement believes that CARRERO was complaining that he was supposed to have been given 4.5 ounces, or close to 126 grams, rather than the 121 grams he received. This also corroborates that UCC1 supplied RIVERA multiple 4.5-ounce quantities of cocaine on January 26, 2014.

**RAYMOND ROLDAN**:

48. Law enforcement believes that RAYMOND ROLDAN and EFRAIM RIVERA supply each other with CDS. In most cases, RIVERA supplies RAYMOND ROLDAN with powder cocaine, and RAYMOND ROLDAN supplies RIVERA with crack cocaine. The series of calls and surveillance observations on January 21, 2014 and January 22, 2014, were indicative of the illicit relationship between RIVERA and RAYMOND ROLDAN.

41

**Events of January 20 through January 22, 2014**

49.     On January 20, 2014, at approximately 1:50 p.m., RAYMOND ROLDAN,

while utilizing telephone facility number (856) 308-1601, which is known to be utilized by

RAYMOND ROLDAN ("the RAYMOND ROLDAN Phone"), called DAISY ROLDAN,[20]

and asked, "do you got CANELO's number?"[21] DAISY ROLDAN provided the number,

telling RAYMOND ROLDAN it was 575-7140.  The conversation revealed that CANELO

is LUIS DIAZ, the person utilizing cellular telephone number (856) 575-7140 (hereinafter

be referred to as "the LUIS DIAZ Phone").

50.     On January 21, 2014, at approximately 12:29 p.m., RIVERA called

RAYMOND ROLDAN.  ROLDAN asked, "You didn't call him?"  RIVERA replied, "Nah,

I'm about to call him now."  At approximately 12:31 p.m., RIVERA called UCC1.   UCC1

said, "I already sat down with these people.  They told me tomorrow.  That's what they

told me, but I didn't want to, you know, I didn't want to tell you nothing, you get what I'm

saying, because I'm tired of..."  RIVERA  replied, "Nah, nigga.  I was up, just trying to

give you a couple dollars, my nigga."  UCC1 said, "Fucking telling me shit.  You get

---

[20]     On January 23, 2014, law enforcement served an administrative subpoena on T-Mobile for the call detail records of (856) 246-9190 ("the DAISY ROLDAN Phone").  The records revealed that the DAISY ROLDAN Phone is a pre-paid cellular phone owned by T-Mobile number.  The tolls ranged from January 4, 2014 through January 23, 2014.  There were a total of 35 contacts between the DAISY ROLDAN Phone and the LUIS DIAZ Phone.

[21]     Law enforcement intercepted several phone calls where RAYMOND ROLDAN and EFRAIM RIVERA both refer to LUIS DIAZ as CANELO, as well as MANUELO.

what I'm saying. He tell me for sure, for sure tomorrow."   Law enforcement believes that RIVERA called UCC1 to see about obtaining a supply of cocaine for himself and RAYMOND ROLDAN, and that UCC1 said his suppliers would have it the next day.

51.   On January 21, 2014, at approximately 3:23 p.m., RAYMOND ROLDAN called DAISY ROLDAN and asked, "Did he ever call you back?"   DAISY ROLDAN said no, but that she would call him now. At approximately 3:24 p.m., the DAISY ROLDAN Phone called the LUIS DIAZ Phone. At approximately 3:27 p.m., DAISY ROLDAN called RAYMOND ROLDAN and said, "He said the same, or what?"   RAYMOND ROLDAN replied, "the same for now."   DAISY ROLDAN asked, "what's that?" RAYMOND ROLDAN replied "two."   Law enforcement believes that RAYMOND ROLDAN asked DAISY ROLDAN to call LUIS DIAZ for a supply of cocaine. LUIS DIAZ wanted to know if RAYMOND ROLDAN wanted the "same."   Based on law enforcement's past experience and in analyzing the intercepts of both RAYMOND ROLDAN and RIVERA, law enforcement believes that RAYMOND ROLDAN's reference to "two" most likely meant two 4.5 ounce-quantities of cocaine.

52.   On January 21, 2014, at approximately 3:43 p.m., EFRAIM RIVERA returned a call from RAYMOND ROLDAN. ROLDAN asked, "Yo, I was seeing if CANELO called you on something."   RIVERA said he had not. RIVERA then asked, "This shit serious. Man. What's up with your peoples. Nothing yet?" ROLDAN replied, "nothing either."   RIVERA said, "my man said tomorrow, man, for sure."   ROLDAN then said, "I'm glad we got it now, then before Christmas."   Law enforcement believes that

43

this series of calls indicates that there is a shortage of cocaine supply. ROLDAN and RIVERA are calling each other to see who has a supply of cocaine. During the conversations, ROLDAN inquired whether "CANELO" had called RIVERA, indicating that CANELO is a supplier of cocaine. As previously stated, based on the information learned during the course of this investigation, law enforcement believes that CANELO is LUIS DIAZ. When RIVERA said his "man said tomorrow" he was most likely referring to the aforementioned call with UCC1.

53. At 5:53 p.m., RAYMOND ROLDAN called DAISY ROLDAN and asked, "Did you call him?" DAISY ROLDAN said she would call him immediately. There were at least five calls between the DAISY ROLDAN Phone and the LUIS DIAZ Phone between from 5:54 p.m. to 6:30 p.m. At approximately 6:31 p.m., DAISY ROLDAN called RAYMOND ROLDAN and said "He (LUIS DIAZ, aka CANELO) said if you can meet him over there at the store where Pulley live at." At approximately 6:32 p.m., RAYMOND ROLDAN called ANTHONY ESPRIT and told ESPRIT that he needed ESPRIT to "take him (RAYMOND ROLDAN) somewhere." At approximately 6:35 p.m., the 1300 Sheridan Street pole camera captured a male believed to be RAYMOND ROLDAN exit 1355 Sheridan Street at the same time a male believed to be ESPRIT exited 1350 Sheridan Street. They entered a Ford Ranger pick-up truck known to be operated by ESPRIT during this investigation, which was parked across the street from 1350 Sheridan Street, and drove off.

44

54.    At approximately 6:47 p.m., the pick-up truck returned and parked across from 1350 Sheridan Street. ROLDAN and ESPRIT exited the pick-up truck and entered 1350 Sheridan Street. At the time, a silver Nissan Maxima with Georgia registration PHN9219 and determined to be a rental vehicle, was parked in front of 1350 Sheridan Street. ANT RAMOS was observed operating this vehicle on and around January 21, 2014. Based on the vehicles observed to be present, it appears that ANT RAMOS was inside 1350 Sheridan Street. Law enforcement believes that RAYMOND ROLDAN asked DAISY ROLDAN to call LUIS DIAZ, aka CANELO, to see if he had cocaine for sale. DAISY ROLDAN then called LUIS DIAZ, who confirmed he did and for RAYMOND ROLDAN to meet him at the store where "PULLEY" lives. Law enforcement believes that PULLEY is a reference to RAMON DIAZ, aka PALUCO, who lives on Morton Street, across from the Andres Supermarket at the corner of Morton Street and Mount Ephraim Avenue, Camden. The address is 1550 Mount Ephraim Avenue. RAYMOND ROLDAN called ESPRIT who then drove ROLDAN to meet with LUIS DIAZ at the "store." Based on the prior discussion between RAYMOND ROLDAN and DAISY ROLDAN, it is believed that DIAZ supplied RAYMOND ROLDAN with at least nine ounces of powder cocaine. Again, as detailed above in this Affidavit, law enforcement believes that LUIS DIAZ normally supplies RAYMOND ROLDAN with nine ounces of powder cocaine. RAYMOND ROLDAN and ESPRIT then returned and entered 1350 Sheridan Street. As discussed in detail later in this Affidavit, 1350 Sheridan Street is a

45

location used by ANT RAMOS and RAYMOND ROLDAN to cook powder cocaine into crack cocaine.

55.    On January 21, 2014, at approximately 9:26 p.m., RAYMOND ROLDAN received a call from cellular telephone facility number (856) 883-9087, a phone known to be utilized by J.H. ("the J.H. Phone"). Your affiant previously had telephone contact with J.H. on the J.H. phone pertaining to the previously mentioned Sheridan Street Investigation. ROLDAN asked, "you wanted to see me now?" J.H. responded that he would be over. At approximately 9:27 p.m., RAYMOND ROLDAN called ESPRIT. ESPRIT said he was down the street and had just "sold one." ESPRIT asked ROLDAN, "Do you need it?" RAYMOND ROLDAN said no and to come get him. At approximately 9:46 p.m., J.H. called RAYMOND ROLDAN and said, "Yo, I'm here." ROLDAN said he was waiting for his nephew.[22]   At about this time, the 1300 Sheridan Street pole camera captured an unknown pick-up truck turn onto Sheridan Street and stop in front of 1355 Sheridan Street. After a few minutes, ROLDAN exited 1355 Sheridan Street and entered the pick-up truck, which then drove off. At approximately 9:54 p.m., the pick-up truck returned to Sheridan Street. ROLDAN exited the passenger seat and entered 1355 Sheridan Street.

---

[22]     During the course of the investigation it was learned from reliable law enforcement sources that ESPIRIT is ROLDAN's nephew and DAISY ROLDAN's son. Furthermore, in a majority of the calls between ESPRIT and DAISY ROLDAN, ESPRIT refers to her as "mom," and in the majority of calls between ESPRIT and ROLDAN, ESPRIT refers to him as "tio" which is Spanish for "uncle."

56.    On January 21, 2014, at approximately 9:52 p.m., the RIVERA Phone sent

the RAYMOND ROLDAN PHONE the text, "nothin yet." The RAYMOND ROLDAN

Phone sent the reply, "Yea call me." The RIVERA Phone sent the reply, "Be out at 12."

The investigation revealed that RIVERA works an evening shift at the Collace Food

produce warehouse in West Deptford, New Jersey. His shift ends anywhere between

midnight and 2:00 a.m. Immediately following this text exchange, RIVERA called three

customers: J.S., "B from Liberty," and GARCIA. The following relates to RIVERA's calls

to these three customers:

> a. At approximately 9:54 p.m., to cellular telephone facility number (856) 203-2252, a phone known to be utilized by J.S.[23] ("the J.S. Phone"). RIVERA told J.S. he "should be out of work by like 11:30." J.S. said, "I got the same thing as that other, time" and "I should be ready by then.";
>
> b. at approximately 9:55 p.m., to cellular telephone facility number (609) 206-6558 ("the 'B' Phone"), being utilized by an unknown male who previously identified himself to RIVERA as "B from Liberty Street" (hereinafter "B"). During the course of the investigation, RIVERA has had numerous contacts and meetings with B. Law enforcement was able to photograph B during one of these meetings but have yet to positively identify him. B is an average sized Hispanic male in his twenties. Based on the communications between RIVERA and B, and surveillance conducted during this investigation, it is readily apparent that B is a customer of RIVERA. At approximately 9:55 p.m. on January 21, 2014, RIVERA called B. B asked, "You got some good news for me?" RIVERA said he did, that he would be out of work at midnight, and asked B, "What you

---

[23]    As provided later in this Affidavit, a reliable FBI CS provided this number and advised that the number was being utilized by J.S., aka HO, who resides at an address in Camden. Public records checks confirmed that J.S. resides at that address. Furthermore, this was corroborated through the monitoring of the RIVERA Phone in which the male utilizing the J.S. Phone referred to himself as "HO." During the investigation, surveillance also observed RIVERA going to this particular address to meet with "HO."

needed?" B said, "one right now...but it might be two." About an hour later, the B Phone sent the RIVERA Phone the text, "2"; and;

c. at approximately 9:57 p.m., to cellular telephone facility number (856) 831-8124, a phone known to be utilized by GARCIA[24] ("the GARCIA Phone"). RIVERA told GARCIA that "Loquin just called me" and he "told me to get with him after work." GARCIA asked what time RIVERA would get out of work. RIVERA told him "11:30, 12" and RIVERA also said, "the other thing, motherfucking, ah, I got a call too, but tomorrow after 3:00." GARCIA asked, "Oh, alright, the other ones, the other way?" RIVERA and RAYMOND ROLDAN refer to each other as "Loquin." "Loquin" is known by law enforcement to be a nickname indicative of endearment or familiarity. Law enforcement interpreted this communication as RIVERA telling GARCIA that he was obtaining crack cocaine from RAYMOND ROLDAN after work that evening and that he was obtaining powder cocaine ("the other ones, the other way") from UCC1 the following afternoon (see the January 21, 2014 call at 12:31 p.m. between RIVERA and UCC1, described above).

57. In summary, law enforcement believes that the events of January 21,

2014 show that RAYMOND ROLDAN was using DAISY ROLDAN to arrange a meeting

with LUIS DIAZ to obtain a supply of at least 9 ounces of cocaine. RAYMOND

ROLDAN then had ESPRIT drive him to meet LUIS DIAZ to pick up the cocaine, which

ROLDAN and ESPRIT took back to 1350 Sheridan Street to process into crack cocaine.

Law enforcement believes that ROLDAN then gave ESPRIT a number of quarter-ounce

---

24      As detailed later in this Affidavit, EFRAIM RIVERA had numerous contacts with the GARCIA Phone, most of which were calls. It was apparent that RIVERA and that male a later identified as GARCIA were related, and that RIVERA supplied this male with varying quantities of powder and crack cocaine. Law enforcement surveilled RIVERA entering 337 Grand Avenue, after conversations between the RIVERA Phone and the GARCIA Phone. Law enforcement confirmed that GARCIA resides at 337 Grand Avenue through surveillance, as well as public records checks. Furthermore, on December 13, 2013, there was a series of calls between RIVERA and the male utilizing the GARCIA Phone, in which the male said that his son had a boxing match that night. Later in the evening of December 13, 2013, the GARCIA Phone called RIVERA, and the male said that his son won. Law enforcement confirmed through public Facebook checks that GARCIA's son had a boxing match that night and won.

quantities of crack cocaine to sell. Law enforcement reached this conclusion based on reliable source information concerning the quantities sold, as well as two controlled purchases law enforcement executed in February and March 2014, in which CW4 purchased a half-ounce of crack cocaine on each occasion from ESPRIT. The half-ounce of crack cocaine was broken down into two quarter-ounce quantities. When ESPRIT said that he sold "one," he likely meant one quarter-ounce quantity of crack cocaine. ESPRIT asked if ROLDAN needed the money from the sale. ROLDAN then arranged to meet with two of his customers, that is, J.H. and RIVERA, and supplied each of them with multiple ounces of crack cocaine.

58. There was a series of calls between RIVERA and RAYMOND ROLDAN in the early morning hours of January 22, 2014, when law enforcement was not monitoring telephone interceptions. Law enforcement believes that RIVERA and ROLDAN met and that ROLDAN supplied RIVERA with crack cocaine during the meeting. Furthermore, law enforcement believes that ROLDAN also supplied J.H. with at least two ounces of crack cocaine. During the previously-described Sheridan Street Investigation, law enforcement conducted two controlled purchases of crack cocaine from J.H., one for 2.5 ounces, and one for 4.5 ounces. J.H. has yet to be charged with these purchases.

59. On January 22, 2014, at approximately 10:19 a.m., the LUIS DIAZ Phone called the DAISY ROLDAN Phone. At approximately 10:20 a.m., DAISY ROLDAN called RAYMOND ROLDAN and told him, "Ray, CANELO just called for you. He said

49

what's up." RAYMOND ROLDAN said he would call him back. At approximately 10:42 a.m., RAYMOND ROLDAN called DAISY ROLDAN. DAISY ROLDAN related to RAYMOND ROLDAN, "he said he gonna be at the store." Based on the previous night's calls, law enforcement believed that the "store" was located at the intersection of Morton Street and Mount Ephraim Avenue.

60.    At approximately 11:00 a.m., RAYMOND ROLDAN called the ESPRIT Phone. ROLDAN told ESPRIT to bring him the truck because he was "gonna go see CANELO real quick. It's important." ESPRIT said the he would take ROLDAN and that he has "seen him too. I (ESPRIT) seen where he at." At approximately 11:12 a.m., the 1300 Sheridan Street pole camera captured ESPRIT's green Ford Ranger pick-up truck, New Jersey registration M32-DPY ("the ESPRIT truck"), turn onto Sheridan Street and park in front of 1355 Sheridan Street. Law enforcement observed ESPRIT, the driver, exit the ESPRIT truck momentarily, then return behind the wheel. ROLDAN exited 1355 Sheridan Street and entered the passenger side of the ESPRIT truck. The ESPRIT truck pulled away and turned on Norris Street.

61.    At approximately 11:15 a.m., surveillance was established in the vicinity of Morton Street and Mount Ephraim Avenue. A surveillance unit conducted a "drive by" and observed the ESPRIT truck parked on the south side of Morton Street, a few car lengths from Mount Ephraim Avenue and directly in front of RAMON DIAZ, aka PALUCO's, apartment at 1550 Mount Ephraim Avenue. Both ESPRIT and ROLDAN

50

were still inside the ESPRIT truck. An unoccupied, gold-colored Acura[25] with New Jersey registration V41-DTW, and known to be operated by LUIS DIAZ ("the LUIS DIAZ Acura") was parked across from the ESPRIT truck, adjacent to Andres' Supermarket. At approximately 11:22 a.m., RAYMOND ROLDAN called DAISY ROLDAN and asked, "can you call him? 'Cause I'm right here in front of PALUCO house."

62. At approximately 11:26 a.m., DAISY ROLDAN called RAYMOND ROLDAN and said he (LUIS DIAZ, aka CANELO) was on his way. At approximately 11:31 a.m., law enforcement surveillance observed a green Mitsubishi Montero with New Jersey registration G86-DPY turn onto Morton Street and stop in the middle of the street, just short of the ESPRIT truck. LUIS DIAZ was observed exiting the passenger seat of the Montero. He walked up to the passenger window of the ESPRIT truck. After a brief moment, DIAZ walked back to his Acura, opened the passenger door and reached in. DIAZ, holding his hands in his pockets, returned to the passenger window of the pick-up truck. After a brief moment, DIAZ returned to the Montero. The Montero pulled off and turned onto Louis Street, followed by the pick-up truck. The pick-up truck continued straight toward Sheridan Street, and the Montero turned right on the next block. Surveillance was terminated at this point. Law enforcement believes that

---

[25] This same vehicle was observed during a meeting between RIVERA and a male believed to be LUIS DIAZ at 1225 Liberty Street on August 29, 2013, just prior to a controlled purchase of nine ounces of cocaine from RIVERA. The license plate observed by law enforcement on that date was reported to be L43DHJ. An inquiry with the New Jersey DMV determined that the Vehicle Identification Number ("VIN") for L43DHJ and V41DTW is the same: 19UYA42472A003919. In addition, both tags are registered to LUIS DIAZ, 2411 Patton Street, Camden.

ROLDAN supplied J.H. and RIVERA with the approximately nine ounces of cocaine that LUIS DIAZ supplied to him (and ESPRIT with the smaller quarter-ounce quantities) the night before (on January 21, 2014). Law enforcement believes that ROLDAN then needed to be re-supplied again. Therefore, it is believed, ROLDAN met LUIS DIAZ on January 22, 2014 to obtain more cocaine.

63.     On January 22, 2014, at approximately 12:08 p.m., RIVERA received a call from B. B complained to RIVERA that "my shit last night was ringing, bro, like, my one kick I had they love that shit. It's gone, and the other one, I'm just kind of, like stuck a little bit, you feel me. It's fucking me up a little bit." RIVERA said, "I don't know why, but it's the same shit my nigga. The same thing."

64.     At approximately 3:31 p.m., RIVERA called RAYMOND ROLDAN. RIVERA complained, "that shit this nigger, ah, Manuelo (LUIS DIAZ), that shit alright?" and then said, "Cuz, because they gave me complaints. They was the same thing you gave me yesterday, right?" and "Yeah on one of them, like one of them was okay and then the other one in the middle was kind of like, came out not tasting right." ROLDAN then admitted, "You know why E, because I ain't, I ain't let it, ah, air out too much, that's why...I was in a rush to see everybody, because everybody was calling me." Law enforcement believes that B was supplied two ounces of the crack cocaine that ROLDAN supplied RIVERA earlier in the morning, and that B called RIVERA to complain that one of the ounces was good, and the other was bad. RIVERA then called ROLDAN to pass on the complaint. This call also corroborates law

52

enforcement's conclusion that LUIS DIAZ supplied ROLDAN in the evening of January 21, 2014, and again in the morning of January 22, 2014. Law enforcement believes that RIVERA sometime refers to LUIS DIAZ as "Manuelo" in a veiled effort to protect his identity from law enforcement scrutiny.

65.    Throughout the court-ordered wiretap of ROLDAN's Phone, ROLDAN routinely called ESPRIT, as well as DAISY ROLDAN (RAYMOND ROLDAN's sister and ESPRIT's mother), to drive him places or to call people for him. Based on the totality of the content of the communications, and in conjunction with physical and electronic surveillance, law enforcement believes that RAYMOND ROLDAN had DAISY ROLDAN and ESPRIT take him to meet with suppliers or customers. Your affiant believes that the above series of events from January 20 through January 22, 2014 corroborate this conclusion.

**LUIS DIAZ, aka CANELO, aka Manuelo**:

66.    It is believed that LUIS DIAZ supplied at least nine ounces of powder cocaine directly to EFRAIM RIVERA, and at least nine ounces of powder cocaine to RIVERA via RAYMOND ROLDAN. As described below, DIAZ was identified after an Acura registered to DIAZ was observed to be present during a meeting with RIVERA just prior to the controlled purchase of nine ounces of powder cocaine on August 29, 2013.    In addition, as provided in the preceding paragraphs, law enforcement believes that on at least two occasions, DIAZ supplied ROLDAN with powder cocaine, which

53

ROLDAN processed into crack cocaine, and supplied to RIVERA for further distribution

to RIVERA's customers. DIAZ has several aliases, including Luis Reyes, and has the

following criminal history in the state of New Jersey:

> i. Arrested on February 9, 1990, by the Camden City Police
> Department and charged with a drug offense. DIAZ was convicted
> of felony cocaine distribution. On July 6, 1990, DIAZ was
> sentenced to five years' confinement.
>
> ii. Arrested on February 10, 1990, by the Camden City Police
> Department and charged with a drug offense. DIAZ was convicted
> of felony cocaine distribution. On July 6, 1990, DIAZ was
> sentenced in the aggregate to five years' confinement.
>
> iii. Arrested on August 6, 1993, by the Camden City Police
> Department and charged with death by auto; aggravated assault;
> kidnap for crime or flight; and criminal attempted murder. DIAZ was
> convicted of 1st degree manslaughter; 2nd degree aggravated
> assault; and 1st degree kidnap for crime or flight. On February 21,
> 1997, DIAZ was sentenced to thirty years' confinement and was
> parole ineligible for ten years.

## August 29, 2013 controlled purchase:

67.    On August 29, 2013, law enforcement utilized CW1 and CW2 to purchase

approximately nine ounces of powder cocaine from RIVERA. Just prior to meeting with

the cooperators, surveillance observed a gold-colored Acura, New Jersey registration

L43-DHJ, drive on Liberty Street and park opposite the RIVERA Chrysler 300. Law

enforcement observed a Hispanic male, approximately 30 to 40 years old, thin build,

short, with slight facial hair, as the Acura's sole occupant. The Hispanic male, believed

to be LUIS DIAZ, exited the Acura and met with RIVERA for a minute or two. At the

time, the surveillance unit was too far away to make a positive identification, and, at the

54

time, law enforcement had not known about LUIS DIAZ. However, based on subsequent investigation and observations of LUIS DIAZ operating the Acura along with the similar physical characteristics (age and size), law enforcement has concluded that this was LUIS DIAZ. DIAZ then re-entered the Acura and departed. RIVERA entered his Chrysler 300 and drove directly to the meeting with the cooperating witnesses, where he supplied nine ounces of powder cocaine in exchange for $10,200. The GPS tracker on the RIVERA Chrysler 300 indicated that RIVERA traveled directly from the exchange with the cooperating witnesses to the vicinity of 2411 Patton Street, Camden, where he remained for less than five minutes, then departed. Law enforcement surveillance drove by 2411 Patton Street ten minutes later and observed the previously-described Acura parked at 2411 Patton Street. Law enforcement also observed DIAZ exit 2411 Patton Street and walk toward the Acura during the above-described surveillance. An inquiry of the New Jersey DMV determined that New Jersey registration L43-DHJ is registered to a 2002 beige Acura CL, registered owner Luis Diaz, with a DOB of December 31, 1971, and an address of 2411 Patton Street, Camden. Based on these observations in conjunction with the controlled purchase, law enforcement believes that DIAZ fronted at least nine ounces of powder cocaine to RIVERA at 1225 Liberty Street. RIVERA then supplied the cocaine to the law enforcement cooperators and delivered the money owed to DIAZ at 2411 Patton Street.

68.    Over the next several weeks, law enforcement surveillance observed DIAZ meeting with different people for short periods of time, and at various locations.

55

This pattern of movement is indicative of a drug dealer supplying customers. Furthermore, two reliable confidential informants familiar with RIVERA, RAYMOND ROLDAN, and several of the other targets in the Sheridan Street Investigation described DIAZ as a drug dealer in Camden associated with subjects in the Sheridan Street Investigation.

**M.C.**:

69.     Law enforcement believes that M.C. supplied EFRAIM RIVERA with powder cocaine on at least two occasions: 4.5 ounces on August 22, 2013; and at least 13.5 ounces on March 2, 2014.   As described below, a gold Honda Accord with New Jersey registration R60-DHJ, was observed to be present during a meeting with RIVERA in front of 1225 Liberty Street on these two dates.   Law enforcement followed the Accord after it pulled away on March 2, 2014 and executed a traffic stop of the Accord a short distance and out of sight of RIVERA.   The lone occupant was identified as M.C., the registered owner of the Accord ("the M.C. Accord").   M.C. has a DOB of April 26, 1980.   An NCIC records check revealed that M.C. has the following criminal history in the state of New Jersey:

        i.     Arrested on August 27, 2007, by the Camden City Police Department and charged with possession/use of CDS; manufacturing/distributing CDS; manufacturing/distributing CDS; possess certain bullets, possession of a hand gun; and possession of a defaced handgun. M.C. was convicted of possession of a handgun, a 3rd degree felony. On January 5, 2009, M.C. was sentenced to three years' confinement.

ii.   Arrested on May 18, 2011, by the Cherry Hill Township Police
      Department and charged with possession of CDS and distributing
      heroin/cocaine. M.C. was convicted of manufacturing/distributing
      CDS, a 3rd degree felony. On July 29, 2011, M.C. was sentenced to
      270 days' home confinement and five years' probation.

## August 22, 2013 controlled purchase:

70.   On August 22, 2013, law enforcement utilized CW1 and CW2 and

purchased approximately 4.5 ounces of powder cocaine from RIVERA in exchange for

$5,100. This controlled purchase is summarized herein. Just prior to meeting with the

CWs, law enforcement observed the M.C. Accord driving up Liberty Street and park

across from the RIVERA Chrysler 300. Law enforcement observed RIVERA exit his

vehicle, enter the rear driver's side door of the M.C. Accord, then return to the RIVERA

Chrysler 300 a brief time later. RIVERA departed in his vehicle and met with the

cooperators around the corner on the 1100 block of Kaighns Avenue. While the

exchange was taking place, a surveillance unit conducted a drive-by spot check and

obtained the registration of the waiting M.C. Accord as New Jersey R60-DHJ, which is

registered. The M.C. Accord was observed to be occupied by two Hispanic males with

the driver being heavier. The surveillance unit was not in a position to make a positive

identification, and at the time, M.C. was unknown to the investigation. After RIVERA

completed the exchange with CW1 and CW2, he drove back in the direction of 1225

57

Liberty Street and the waiting M.C. Accord.   Law enforcement believes that occupants

of the Accord were waiting for the money from the sale.

## Events of March 2, 2014

71.   On March 1, 2014, at approximately 4:06 p.m., RIVERA returned a call to

cellular telephone facility number (856) 952-6772, a phone known to be utilized by

DANIEL ALSTON[26] ("the ALSTON Phone").  ALSTON asked, "Hey, um, I need to make

that, uh, New York trip, you heard . . . to take that ride up to hundred and twenty fifth."

ALSTON said it was for his "peoples."  RIVERA said, "you gonna bring that, you know

what I mean, COD with you, right . . . I'm saying, you gonna have the paper already with

you, though, right?"   Law enforcement believes that ALSTON was ordering "hundred

and twenty fifth" for an unknown criminal associate, meaning 125 grams or

approximately 4.5 ounces of powder cocaine.  RIVERA wanted to make sure ALSTON

was going to have the "COD" or "Cash On Delivery," meaning ready cash payment for

the cocaine.

---

26   As provided later in this Affidavit, law enforcement has concluded that Alston utilized (856) 952-
6772. This phone is owned by Cingular Wireless and subscribed to Alston, with an address in Camden,
and with a credit address in Lindenwold, New Jersey.   Public records checks indicate that ALSTON is
associated with both addresses.  In addition, in a phone conversation with RIVERA, ALSTON told
RIVERA that his mother resides on a street consistent with the subscriber's Camden address.  On
January 26, 2014, law enforcement intercepted a series of calls between RIVERA and ALSTON where it
was evident to law enforcement that RIVERA was going to Lindenwold to supply ALSTON with an
unknown amount of cocaine.  Surveillance followed RIVERA to the subscriber's Lindenwold address.
Furthermore, as provided elsewhere in this Affidavit, on March 2, 2014, ALSTON arranged for RIVERA to
supply "125th Street" to his associate and told RIVERA that he was going to have his associate call
RIVERA.  Shortly after this call, the associate called RIVERA and identified himself as "Boo's peoples."
Law enforcement knows that "Boo" is a nickname for ALSTON.

72.     At approximately 5:39 p.m., RIVERA received an incoming call from (787) 673-7277, a phone known to be utilized by M.C. ("the M.C. Phone")[27].   RIVERA said, "Yo, what's up brother, you've been lost."  The male caller responded, "Ah, I've been gone awhile" and then said, "My friend has work and called me."  RIVERA asked, "And what's the number?"  The male caller later identified as M.C. replied, "It's at forty five."  Based on the content and tone of the conversation, it is readily apparent to law enforcement that M.C. and RIVERA were familiar with each other.  When M.C. said, "my friend has work," law enforcement believes that M.C. was telling RIVERA that his friend has cocaine ("work") for sale.  RIVERA knew immediately what was meant and asked, "what's the number?," or in other words, what was the price of the cocaine.  M.C. replied it was "forty five," meaning $4,500.  This price is consistent with the wholesale price of 4.5 ounces of cocaine.  Accordingly, law enforcement believes that M.C. supplied cocaine to RIVERA in the past.  Law enforcement made this conclusion based on the obvious familiarity with each other, the unfaltering tone of the conversation, and that RIVERA was familiar with the terminology that M.C. used.   Law enforcement believes that the evidence provided in this Affidavit clearly indicates that RIVERA is routinely supplied powder cocaine in 4.5-ounce quantities from his various suppliers.

---

[27]     The conversations between RIVERA and M.C. are in Spanish.  The associated Spanish language text incorporated in this Affidavit is the English translation.

59

This also indicates that M.C. supplied RIVERA with 4.5-ounce quantities of cocaine on at least one previous occasion.

73.     At approximately 6:47 p.m., RIVERA called GIOVANNY CARRERO. CARRERO asked, "Yo, do we have two around there?"  RIVERA said he did not have one available, adding, "But I can find from my other friend, but I don't know how much it is."  At approximately 6:56 p.m., RIVERA spoke with M.C.  RIVERA asked, "look, is your friend, is that straight?" M.C. replied, "Yeah, hell yeah. Fire!"  M.C. went on to say that he sold two the day before.  Law enforcement is familiar with the term "Fire" which is a common term used to describe highly pure or potent cocaine or heroin.  M.C. called RIVERA back a few minutes later and said, "Right now he can't, because he is doing something.  But when he finishes, he will call me later, when he is done."  Based on the conversations with ALSTON and CARRERO, it appears RIVERA had an order for three 4.5-ounce quantities of powder cocaine (13.5 ounces total), and called M.C. to fill it. M.C. then called his supplier, who was busy at the time.

74.     On March 2, 2014, at approximately 3:32 p.m., RIVERA called CARRERO.  CARRERO asked, "Do you have any bikes over there?" RIVERA said, "I just got up, yeah, I'm gonna have it, well, yo, like, like, in twenty minutes."  CARRERO said he needed three.  RIVERA said he would call CARRERO back.  RIVERA placed two unanswered calls to M.C.  M.C. finally called back and said, "He's ready."  RIVERA said, "I need three of them."  M.C. placed an unanswered call to RIVERA a minute later.  RIVERA called M.C. right back.  M.C. said, "It's, yeah, it's for sure, for sure that

he is going to break it up now. He, he called me. He told me yeah, that he is going to break it up." According to law enforcement, the term "break it up" is a common term used when drug dealers break up a kilogram or "brick" of cocaine into smaller amounts, in this case, three 4.5-ounce quantities.

75.    At approximately 5:38 p.m., M.C. called RIVERA and asked, "where are you, at your mom's house?" RIVERA answered yes. M.C. then said, "I'm just getting there." At approximately 5:42 p.m., the Liberty Street pole camera captured a gold Honda Accord driving up Liberty Street. It parked a few doors down from 1225 Liberty Street. At 5:43 p.m., the M.C. Phone sent the RIVERA Phone the text, "I'm here". Law enforcement surveillance drove by and observed the M.C. Accord with the same New Jersey registration R60-DHJ recorded by law enforcement during the controlled purchase on August 22, 2014. At approximately 5:44 p.m., RIVERA exited 1225 Liberty Street and entered the passenger seat of the M.C. Accord. At approximately 5:46 p.m., RIVERA called CARRERO and said, "I have two." CARRERO said, "Only two? All good, I'm going to check in a moment." At approximately 5:56 p.m., the M.C. Accord pulled off.    Based on the earlier calls, RIVERA asked M.C. for "three," which, as detailed above, means three 4.5-ounce quantities of powder cocaine (13.5 ounces of powder cocaine). Law enforcement further believes, based on the sequence of calls between RIVERA, M.C., CARRERO, and ALSTON, that nine ounces was for CARRERO and 4.5 ounces was for ALSTON.

61

76.     At approximately 6:10 p.m., RIVERA called ALSTON. ALSTON said, "I'm a call bro. I just probably, know what I mean, we probably just go to New York." RIVERA replied, "Yeah, well see how long that gonna take, 'cause I'm a ready to step out." Based on the earlier reference by ALSTON on March 1, 2014 to "New York" and "hundred and twenty fifth," law enforcement believes that ALSTON's "peoples" needed a 4.5-ounce quantity of cocaine.

77.     At approximately 6:26 p.m., RIVERA called ALSTON. ALSTON said, "I told him to call you, he ain't call you?" RIVERA said no. ALSTON said, "Alright, let me call him right back." At approximately 6:29 p.m., RIVERA received a call from telephone number (856) 308-3515. The male caller said, "This Boo peoples." The caller then said, "I'm uhh, I'm ah, fuck with you with Joe, ya heard?" According to law enforcement sources, ALSTON is commonly called "BOO" by his associates. Based on my training and experience, I am aware that the term "Joe" is a common street term for a 4.5-ounce quantity of cocaine.

78.     At approximately 6:31 p.m., M.C. called RIVERA. RIVERA said, "I'm still here at my mom house waiting for this bastard to pull up." M.C. said, "Oh, yeah. Pretty soon because it's that my boy called me, to see what I did with that." RIVERA said, "All good, give it like, I'm gonna give it like twenty minutes more, 25 minutes more. If he don't get here then you can come get it. I'll just tell nigga that he got fucked." Law enforcement interprets the above events as M.C. delivering three 4.5-ounce quantities of cocaine to RIVERA: two for CARRERO and one for "BOO's peoples." M.C. then

pulled off while RIVERA waited for his two customers to arrive with the money for the cocaine.

79.    At approximately 7:03 p.m., RIVERA received a call from "BOO's peoples."   RIVERA gave him directions to his house on Liberty Street.  The Liberty Street pole camera captured a sedan parking a few doors down from 1225 Liberty Street.  One of the sedan's occupants exited the vehicle and walked up to a male identified as RIVERA for a brief moment. This unknown individual then returned to the sedan, which then departed.  Law enforcement believes that RIVERA supplied "BOO's peoples" with 4.5 ounces of powder cocaine in exchange for at least $4,500, consistent with the March 1, 2014, 5:39 p.m. call from M.C. to RIVERA.  As previously stated, law enforcement believes that M.C. charged RIVERA $4,500 for 4.5 ounces of cocaine.  It is believed that RIVERA therefore most likely charged "BOO peoples" a resale price greater than $4,500, in order to earn his profit.

80.    At approximately 7:07 p.m., RIVERA called M.C. and told him to come to 1225 Liberty Street.   Law enforcement observed RIVERA enter the passenger seat of a white Chevrolet Impala with Tennessee registration G25-08Z and pull off.    The Impala returned a minute later. This Impala is a Hertz rental vehicle. A few minutes prior, your affiant observed J.M. behind the driver's wheel of the Impala. She was stopped on Liberty Street, at the intersection with Louis Street.  Law enforcement was  unable to observe if the passenger seat was occupied.  Law enforcement believes that RIVERA

63

met with M.C. who, consistent with the earlier intercepted phone call, supplied RIVERA with the three 4.5-ounce quantities of cocaine in exchange for at least $13,500.

81.    At approximately 7:09 p.m., law enforcement observed the M.C. Accord return to Liberty Street and park directly across the street from 1225 Liberty Street. RIVERA crossed the street, was obstructed from the camera's view for a minute, and then returned to 1225 Liberty Street.  The M.C. Accord then departed.  Law enforcement monitored the M.C. Accord travel a short distance from Liberty Street, then directed a Camden County Metro Police Officer in a marked unit to conduct a traffic stop of the vehicle.  The lone occupant provided an operator license and was identified as M.C., the registered owner of the vehicle.  Following the stop, M.C. was allowed to continue on.

## **RIVERA DTO FACILITATOR**:

### **J.M.**

**J.M.**:

82.    J. M. resides at 3069 Stevens Street with EFRAIM RIVERA.  She is the mother of at least one of his children.   J.M. has four arrests in New Jersey but no felony convictions.    Law enforcement believes that J.M. routinely drives RIVERA to and from

drug-related meetings with suppliers and customers, hides or "stashes" the CDS to avoid police detection, and coordinates meetings between ANT RAMOS and RAYMOND ROLDAN with RIVERA.

83. J.M. accompanied RIVERA on at least three of the controlled purchases: November 21, 2013; February 8, 2014; and February 22, 2014. On November 21, 2013 and February 8, 2014, J.M. was the passenger in the RIVERA Chrysler 300.

84. On November 21, 2013, during a controlled purchase of cocaine, RIVERA pulled up to CW2's vehicle ("CW2's vehicle"), which was waiting in the parking lot of the Pathmark shopping plaza on Mount Ephraim Avenue. RIVERA exited his vehicle and entered CW2's vehicle to make the exchange.

85. On February 8, 2014, J.M. travelled with RIVERA in the RIVERA Chrysler 300. RIVERA had CW2 meet him at the Payless Shoe Store across the street from the Pathmark shopping plaza. CW2 entered the front passenger seat of the RIVERA Chrysler 300 as J.M. went shopping inside the Payless store. J.M. came out and waited for CW2 and RIVERA to finish the exchange. When CW2 exited the RIVERA Chrysler 300, J.M. got in. On February 22, 2014, J.M. drove RIVERA in her Chevrolet Tahoe to the meeting with CW2. The exchange was completed inside the Tahoe with J.M. behind the wheel.

86. On February 8, 2014, law enforcement monitored several calls between EFRAIM RIVERA and GIOVANNY CARRERO. At approximately 11:19 a.m., RIVERA called CARRERO. CARRERO said that he "need(ed) some motherfucking, um, hard,

65

yo," and "right now, if you have it go and get it."  RIVERA asked how many.  CARRERO replied, "Two quarters."  At approximately 11:41 a.m., CARRERO called RIVERA. RIVERA said, "I'm about to go to my mom's house right now.  Well I'm looking for the other one, I have one on me but I'm looking for the other one and I don't know where the hell she put it."  At approximately 12:00 p.m., CARRERO called RIVERA again. RIVERA said, "I only have the soft," and "I'm gonna go by there so she can tell me where it's at, because I don't want to talk to her over the phone."  At approximately 12:11 p.m., CARRERO called RIVERA again.  RIVERA said he was at his mother's house (1225 Liberty Street) and that he "was waiting on her to get here so I (RIVERA) can get it."  Law enforcement believes that CARRERO was trying to obtain two quarter-ounce quantities of crack cocaine, but RIVERA only had one with him and needed J. M. to get him the second one.

87.     On February 28, 2014, at approximately 4:19 p.m., RAYMOND ROLDAN called ANT RAMOS.  They talked about a male, "C.T.," turning himself in.  RAMOS said, "I seen Art, and shit, I'm like, yo, you got the people. He like, 'yeah, but I don't got their number'."  ROLDAN then asked, "What's up with Fat Boy?"  RAMOS said nothing was.  The investigation has revealed that ROLDAN refers to D.S. as "FROG" and/or "FAT BOY."  The investigation also revealed that C.T. is believed to be a source of supply to ROLDAN, according to reliable law enforcement sources.  On February 28, 2014, C.T. self-surrendered to police on an outstanding warrant.  Art is believed to be an individual known to law enforcement and known to be criminally associated with C.T.

Law enforcement believes that RAMOS and ROLDAN were looking for a source of supply during the aforementioned conversation.

88.     At approximately 7:03 p.m., J.M. called ANT RAMOS.  J.M. said, "My boy (EFRAIM RIVERA) said what's up?" and "you going around there to his mom's?" and referring to EFRAIM RIVERA as "E."  RAMOS replied, no, that he was going to see RAY.  At approximately 7:08 p.m., RAMOS called RAYMOND ROLDAN.  RAMOS asked, "you do that?"  ROLDAN said, "this guy, he chasing me down in like ten minutes, fifteen minutes."  RAMOS asked, "Who?"  ROLDAN replied, "E."  RAMOS said, "Oh, you didn't see him yet?"  ROLDAN replied, "Nah" and asked, "What you want me to do, just grab that one for now?"  RAMOS replied, "Alright, well just grab the one, and then if he's going to be around, then if it's straight, we'll just keep calling him."  Law enforcement believes that RAMOS and ROLDAN were trying to obtain a supply of cocaine because their suppliers, C.T. and D.S., were unavailable at the time.  Based on the above, it was readily apparent that ROLDAN had made arrangements with RIVERA for the cocaine.

89.     As detailed above, on March 2, 2014 when M.C. supplied RIVERA, law enforcement believes that J. M. was the driver of the Chevrolet Impala Hertz rental and drove RIVERA to and from the exchange with M.C., as well as with CARRERO.  As stated above, at approximately 7:00 p.m., surveillance observed J.M. behind the wheel of the Chevrolet Impala Hertz rental. This was a few minutes prior to the meeting between M.C. and RIVERA.  The vehicle was stopped on Liberty Street, at the

67

intersection of Liberty and Louis Streets.   The DAISY Avenger was stopped adjacent to
the Chevrolet Impala.  The vehicles were blocking traffic.   Surveillance was unable to
see who was in the DAISY Avenger.

## RIVERA DTO CUSTOMERS/REDISTRIBUTORS:

## GARCIA, B.F., ALEXANDER, J.S., VELEZ, M.R., ALSTON, DEMBY, CARRERO, K.R. and JACKSON

### ANGEL GARCIA, aka JUNGO:

90.   Based on the phone analysis, monitoring of the wire intercepts, and
physical and electronic surveillance, law enforcement has determined that from
December 5, 2013, to February 21, 2014, EFRAIM RIVERA supplied GARCIA on at
least twenty occasions with varying amounts of powder and crack cocaine, ranging from
quarter-ounce quantities up to multiple ounces.  Law enforcement has conservatively
concluded that RIVERA has supplied GARCIA with at least twenty ounces of powder
cocaine and 9.5 ounces of crack cocaine during the course of the investigation from
between December 5, 2013 to February 21, 2104.    There were approximately 281
contacts between the RIVERA Phone and the GARCIA Phone.

91.   An NCIC records check revealed that GARCIA has the following criminal
history in the state of New Jersey:

> i.   Arrested on July 4, 1999 by the Camden City Police Department, and
> charged with robbery, possession of defaced firearms; possession of
> certain bullets; and possession of a handgun.  GARCIA was convicted
> of possession of a firearm for an unlawful purpose, a 2nd degree felony,

68

and was sentenced on March 24, 2000, to six years' confinement and three years' probation.

ii.    Arrested on September 24, 1999 by the Camden County Prosecutor's Office, and charged with manufacturing/distributing CDS. GARCIA was convicted of manufacturing/distributing CDS, a 3rd degree felony. GARCIA was sentenced in the aggregate on March 24, 2000 to three years' confinement.

92.    Law enforcement first started focusing on GARCIA during a June 19, 2013 controlled purchase of 4.5 ounces of powder cocaine from EFRAIM RIVERA by CW1. On June 19, 2013, law enforcement observed RIVERA enter a rental vehicle and drive from his residence at 3069 Stevens Street, Camden, to an apartment complex at Grand Avenue and Berkeley Street, Camden. Law enforcement soon learned from cooperating witnesses that RIVERA was related to "JUNGO," who lived at 337 Grand Avenue, Apartment A. Public records checks of 337 Grand Avenue, Apartment A identified that address as GARCIA's residence. The identification of GARCIA as JUNGO was confirmed through public Facebook accounts, physical surveillance, and cooperating witnesses.

93.    When the initial court-authorized wire intercept of the RIVERA Phone began on December 4, 2013, it became readily apparent that it was RIVERA who supplied GARCIA with powder and crack cocaine. The amounts varied from quarter-ounce quantities of cocaine, up to multiple-ounce quantities. During the investigation, law enforcement also learned that GARCIA and several co-conspirators sold quarter-

ounce quantities of cocaine and greater out of 337 Grand Avenue, Apartment A. Law enforcement believes that GARCIA leads his own DTO which controls the redistribution of cocaine he receives from RIVERA, but that RIVERA has sometimes been contacted by associates of GARCIA's DTO and supplied them directly with cocaine. Some of these associates include B.F., J.S. and ALEXANDER.

94.    Law enforcement has monitored phone conversations between RIVERA and GARCIA in which it was readily apparent to law enforcement that GARCIA was ordering an amount of cocaine (crack and/or powder). On several of these occasions, physical surveillance has observed RIVERA driving to 337 Grand Avenue and entering and exiting the apartment building.

95.    For example, on December 19, 2013, at approximately 12:30 p.m., GARCIA called RIVERA. GARCIA said, "Benjamin is calling me. He wanted one of those loose ones, blowing my phone up last night." RIVERA said that he would be about 25 minutes. GARCIA then said, "Alright, I'll call right away for him to bring me the money."

96.    At approximately 1:50 p.m., RIVERA called GARCIA. GARCIA asked, "you want me to tell all these niggas to go over there right now and meet you at my house?" RIVERA said, "Yeah, if you want." At approximately 1:52 p.m., the Liberty Street pole camera captured the RIVERA Chrysler 300 drive up Liberty Street and park in front of 1225 Liberty Street. RIVERA was observed exiting his vehicle, opening up

70

the side gate, and walking towards the back of the residence out of view of the pole camera. He returned a minute later and departed in his Chrysler 300.

97. At approximately 2:10 p.m., law enforcement surveillance observed the RIVERA Chrysler 300 pull up on Grand Avenue and park in front of 337 Grand Avenue. RIVERA walked up to the front steps and conversed with an unknown Hispanic male, then returned to his Chrysler 300. At approximately 2:21 p.m., a silver GMC Terrain SUV with South Carolina registration IPS-324, pulled up and parked on Grand Avenue, near the RIVERA Chrysler 300. The GMC was occupied by a lone Hispanic male, later identified as B.F., aka BENJIE. RIVERA went up to the driver's window of the GMC and leaned in. After a brief minute, RIVERA walked away and the GMC departed. Surveillance followed the GMC to Raritan Street, where it parked. The driver exited and entered 420 Raritan Street. Public records checks determined that B.F. is associated with 420 Raritan Street. The law enforcement surveillance units that observed the above-described events identified a photograph of B.F. as the driver of the GMC. It is the opinion of law enforcement that this incident corroborates the conclusion that RIVERA supplies GARCIA and his DTO.

98. Other examples highlighting GARCIA's role in the RIVERA DTO include: (a) on December 27, 2013, GARCIA called RIVERA and asked, "So, can you bring one too, BENJIE gave me the money yesterday. It's for BENJIE." Again, this shows GARCIA asking for "one," which law enforcement believes refers to at least one ounce of cocaine, which GARCIA intended to give to "BENJIE," believed to be B.F.; and (b), on

71

January 5, 2014, RIVERA called GARCIA. GARCIA asked, "Can you get one, one of these, one that isn't done. Yeah, one that not done and one that's done," and "the one that's done for him and one for mine." Law enforcement believes that GARCIA ordered an ounce of crack cocaine for an unknown associate of GARCIA and an ounce of powder cocaine for himself.

99.     During the course of the investigation, there are numerous other examples of RIVERA supplying GARCIA. On January 7, 2014, at approximately 11:56 p.m., the RIVERA Phone sent the ROLDAN Phone the text, "U up." On January 8, at approximately 12:11 a.m., RIVERA called GARCIA and said, "…I can see this nigga real quick. I'm trying to wake his ass up." GARCIA asked, "Oh, how you got it, the way you gave it to me earlier?..." and "I'm gonna call BENJIE, because BENJIE, he just called me right now, he's like, 'Yo, what's good.' I said, 'I just called my cousin, I got to wait 'til he gets out of work, so.' I'll call him right now and tell him to bring me the money." RIVERA said, "All good. I'll be down there." Law enforcement believes that RIVERA was trying to wake up ROLDAN to obtain crack cocaine for GARCIA. GARCIA's question, "how you got it, the way you gave it to me earlier?.." most likely refers to a previous supply of crack cocaine from RIVERA. Law enforcement believes that BENJIE called GARCIA looking for more crack cocaine from RIVERA. GARCIA said he would get BENJIE's money, most likely for the crack cocaine.

100.    In another example, law enforcement believes, as previously mentioned, that on January 21, 2014, after RIVERA was told by RAYMOND ROLDAN that he

72

(ROLDAN) had a supply of crack cocaine for RIVERA, RIVERA called GARCIA and made arrangements to supply GARCIA.

### ALI ALEXANDER, aka ALI AL:

103.    Based on the phone analysis, monitoring of the wire intercepts, physical surveillance, and law enforcement controlled purchases, law enforcement has determined that from December 2013, through March 2014, ALEXANDER was, and remains, a participant in the RIVERA DTO. There were at least fourteen contacts between ALEXANDER and EFRAIM RIVERA. Law enforcement believes that ALEXANDER works for GARCIA's DTO but also has access to RIVERA based on the intercepted calls. ALEXANDER also utilizes another supplier when GARCIA is not available. A reliable confidential source has advised law enforcement that ALEXANDER sold crack cocaine for GARCIA out of 337 Grand Avenue and provided ALEXANDER's cellular phone number as (856) 571-6779 ("the ALEXANDER Phone").

104.    On December 28, 2013, law enforcement established surveillance of 337 Grand Avenue, Apartment A. Law enforcement observed a group of Hispanic males, including GARCIA, and a larger light-skinned black male with braids, whom law enforcement easily identified as ALEXANDER. Several of the males, including ALEXANDER and GARCIA, loitered in front of the apartment entrance. There were at least two individuals who walked up to the group of males, and then walked away a minute later. Based on my experience, the activity was clearly consistent with an open-

air drug market, with the CDS stashed in the lower left apartment, also known as

Apartment A.    This is consistent with information provided by reliable FBI sources.

Your affiant observed ALEXANDER going back and forth to a white sedan. At one

point, after exiting the white sedan, ALEXANDER conversed with GARCIA, walked into

the apartment, and then re-entered the rear passenger seat of the sedan for a brief

moment. After ALEXANDER exited, the sedan departed.    Law enforcement believes

that the white sedan was occupied at the time by one of ALEXANDER's customers, who

placed an order for an unspecified amount of CDS. ALEXANDER then went to GARCIA

to inform him of the request. ALEXANDER then went into the apartment to retrieve the

requested amount, and returned to the customer and made the sale.

105.    An NCIC data base check revealed that ALEXANDER has the following

convictions in the State of New Jersey:

> i.    Arrested on May 9, 2000, by the Camden City Police Department, and charged with manufacture/distribution of CDS. ALEXANDER was convicted of Possession of CDS, a 3rd degree felony.  On July 28, 2000, ALEXANDER was sentenced to 180 days' confinement and four years' probation.

> ii.    Arrested on July 2, 2001, by the Camden City Police Department, and charged with possession of CDS and manufacturing/distributing CDS. ALEXANDER was convicted of distribution of heroin/cocaine, a 3rd degree felony. On March 22, 2002, ALEXANDER was sentenced to two years' probation.

> iii.    Arrested on January 9, 2003, by the Lindenwold Police Department, and charged with robbery by force and burglary. ALEXANDER was convicted of failure to notify law enforcement, a

74

4th degree felony. On April 11, 2003, ALEXANDER was sentenced to eighteen months' confinement.

iv.   Arrested on May 6, 2005, by the Pine Hill Police Department, and charged with possession of CDS and distribution of heroin/cocaine. ALEXANDER was convicted of possession of CDS, a 3rd degree felony. On August 3, 2005, ALEXANDER was sentenced to four years' confinement and five years' probation.

v.   Arrested on April 21, 2006, by the Gloucester Township Police Department and charged with possession of CDS. ALEXANDER was convicted of possession of CDS, a 3rd degree felony. On October 20, 2006, ALEXANDER was sentenced to 364 days' confinement and five years' probation.

vi.   Arrested on December 30, 2007, by the Bellmawr Barracks of the New Jersey State Police, and charged with attempting to elude police. ALEXANDER was convicted of attempting to elude police, a 2nd degree felony. On August 13, 2008, ALEXANDER was sentenced to five years' confinement.

vii.   Arrested on November 18, 2011, by the Pine Hill Police Department, and charged with obstruction of the administration of law; conspiracy; and kidnapping for ransom or hostage. ALEXANDER was convicted of threatening to commit a crime, a 3rd degree felony. On September 7, 2012, ALEXANDER was sentenced to three years' confinement, with one year of parole ineligibility.

106.   On January 12, 2014, in the early afternoon, a confidential informant ("CI")

placed a call to ALEXANDER at the ALEXANDER Phone in the presence of your

affiant. The CI requested to purchase an amount of crack cocaine. The CI asked

ALEXANDER for "14." ALEXANDER said he would get it. At approximately 1:57 p.m.,

the ALEXANDER Phone called RIVERA. The caller, who was overheard by your

affiant, said, "Yo, EFRAIM, it's ALI." RIVERA replied, "I don't know who name you're

screaming." ALEXANDER replied, "I said this is ALI AL." RIVERA said, "Yeah, man,

but don't be screaming no names." ALEXANDER said, "my bad" and then said, "I don't know who going to be winning the half time." RIVERA responded, "alright" and the call ended shortly thereafter. Law enforcement believes that ALEXANDER called RIVERA almost immediately after taking the order from the CI for "14," or half an ounce of crack cocaine, and used the reference to "half time" to request the half-ounce of crack cocaine from RIVERA. The fact that RIVERA was upset when ALEXANDER used his name is indicative of a drug dealer not wanting to identify himself, in order to avoid law enforcement detection. After the exchange between ALEXANDER and RIVERA, the CI was directed to cancel the request. Law enforcement did not execute a controlled purchase on this date.

107.   On January 15, 2014, a cooperating witness (CW3)[28] was directed to contact ALEXANDER and arrange to purchase half an ounce of crack cocaine. At approximately 12:07 p.m., CW3 sent the text to the ALEXANDER Phone, "Hey I need a size 14 dress I will be there between 4-4:30 to pick it up." At approximately 4:43 p.m., CW3 sent the ALEXANDER Phone the text, "5 min," meaning five minutes away. At approximately 4:55 p.m., the ALEXANDER Phone called the RIVERA Phone, but there was no answer. At approximately 5:07 p.m., CW3 arrived at 337 Grand Avenue and

---

[28]   CW3 began cooperating with the FBI in December of 2013. CW3 has no criminal history. CW3 has been utilized to execute three controlled purchases. CW3's information has proven reliable and accurate. CW3 is cooperating for sentencing consideration of an associate. CW3 has not received monetary payments from the FBI for information provided. FBI agents involved in the investigation are unaware of any unauthorized criminal activity by CW3 during the course of CW3's cooperation with the Government.

parked CW3's vehicle in front of that address.   At approximately 5:17 p.m., RIVERA

returned the call to ALEXANDER.   ALEXANDER said, "I'm good now. Yeah, I called

you.  I wanted to, um, watch a movie with you, but I just, I called my girlfriend."   Law

enforcement believes that ALEXANDER had initially called RIVERA for the half-ounce

of crack cocaine, and when he could not obtain it, ALEXANDER went to someone else.

108.   At approximately 5:35 p.m., a light-colored minivan pulled up, and two

males exited.   Because of the time of day, it was too dark for surveillance to obtain a

positive identification; however, CW3 later identified the passenger in the vehicle as

ALEXANDER.   The unknown male driver ("UM1") entered 337 Grand Avenue.

According to CW3, ALEXANDER entered CW3's vehicle briefly, then exited the car and

entered 337 Grand Avenue.  CW3 departed the area and was monitored to the pre-

designated meet location.   Law enforcement recovered a clear plastic bag containing

approximately half an ounce of an off-white chunky substance, suspected crack

cocaine, and the recording device, which was deactivated.[29]   Law enforcement

subsequently field-tested the substance, which reacted positive, indicating the presence

of cocaine.   CW3 advised that ALEXANDER was dropped off by the minivan and

entered CW3's vehicle.  They exchanged the crack cocaine for $575.  ALEXANDER

---

[29]    As noted above, in each of the controlled purchases outlined in this Affidavit, the CW and the
CW's vehicle were searched before and after the controlled purchase with negative results.  The CW was
provided currency and a recording device then monitored to and from the meeting with the target.  After
the exchange, the recorders were deactivated, the CW was debriefed, the alleged CDS field-tested and
reacted positively and was subsequently submitted to the DEA lab for analysis.

77

exited the car and walked directly into the adjacent apartment building (337 Grand Avenue).

109.    CW3 participated in two more controlled purchases from ALEXANDER: (a) one on February 23, 2014 for approximately a quarter-ounce of suspected crack cocaine; and (b) another on March 2, 2014 for approximately a half-ounce of crack cocaine.  They were both executed in similar fashion in front of 337 Grand Avenue.  On both occasions, law enforcement positively identified ALEXANDER as the seller.

## J.S., aka HO:

110.    Based on the phone analysis, monitoring of the wire intercepts, physical and electronic surveillance, and law enforcement controlled purchases, law enforcement has determined that from December, 2013, through February 21, 2014, EFRAIM RIVERA supplied J.S. with cocaine.[30]  RIVERA would meet J.S. at 1225 Liberty Street, 417 Pfeiffer Street, or 337 Grand Avenue, in Camden.  RIVERA and J.S. met on at least seven occasions where law enforcement believes that RIVERA supplied

_____

30    A reliable FBI CI advised law enforcement that J.S. was known as "HO," and that J.S. is supplied by GARCIA and sometimes sells for GARCIA at 337 Grand Avenue.  This same CI also advised law enforcement that J.S. was utilizing phone number (856) 203-2252.  Later in the investigation, it was determined that J.S. was also utilizing cellular telephone number (856) 366-8836.  There were 64 calls and/or text messages between EFRAIM RIVERA and cellular telephone facility number (856) 203-2252 utilized by J.S. ("the J.S. Phone#1") and 116 calls and/or text messages between RIVERA and cellular telephone facility number (856) 366-8836 utilized by J.S. ("the J.S. Phone#2").  Law enforcement believes that J.S. is associated with and supplied cocaine by GARCIA based on the information provided by the reliable FBI CI; however, based on this investigation, law enforcement also believes that J.S. is engaged in the distribution of cocaine that he receives from RIVERA, as well.

78

at least 1.75 ounces cocaine.   It is unknown if this is powder or crack cocaine.   This figure is very conservative.   There are a number of phone conversations between RIVERA and J.S. that, according to law enforcement's interpretation, are clearly related to RIVERA supplying J.S.   There is only one communication between RIVERA and the J.S. Phone#2, on February 18, 2014, where J.S. refers to amounts.   J.S. sent RIVERA the text, "This is 6 pont 2.  Bude.  Short."  Law enforcement believes that J.S. was referring to 6.2 grams of cocaine, which is short of seven grams (quarter of an ounce).   Based on the investigation and the monitoring of RIVERA's communications, it is believed RIVERA will deliver a minimum of a quarter-ounce of cocaine, so this is the figure used in producing a total amount supplied to J.S.  However, the actual figure is likely much greater.

111.   On December 14, 2013, the aforementioned reliable FBI CI advised that "HO" associated with GARCIA, sold mostly crack cocaine, that he lived at 417 Pfeiffer Street, Camden, drove a blue Chevrolet Blazer, had a cellular phone number (856) 203-2252, and was going to meet a customer later that evening.   Surveillance was established at 417 Pfeiffer Street.  A light-colored sedan was observed parked in front of the residence.  A blue Chevrolet Blazer pulled up with New Jersey registration S12-CLT ("the J.S. Blazer").  The driver exited the J.S. Blazer and entered the rear passenger seat of the sedan, remained briefly, then departed.   Public records and arrest checks determined that J.S. resided at 417 Pfeiffer Street, Camden, and that J.S. was known

by law enforcement to use the nickname "HO." Moreover, on January 3, 2014, J.S.

identified himself as "HO" in an intercepted conversation with RIVERA.

112.    An NCIC data base check revealed that J.S. has the following

convictions in the State of New Jersey:

> i.    Arrested on December 6, 1996, by the Camden City Police
> Department, and charged with possession of CDS; and
> manufacture/distribution of CDS. J.S. was convicted of
> distribution of heroin/cocaine, a 3rd degree felony. On July 25,
> 1997, J.S. was sentenced to two years' probation.
>
> ii.   Arrested on February 20, 2009, by Pennsauken Township Police
> Department and charged with resisting arrest/ and attempting to
> elude police. J.S. was convicted of attempting to elude police, a
> 2nd degree felony. On December 4, 2009, J.S. was sentenced to
> six years' confinement.

113.   On January 19, 2014, at approximately 2:27 p.m., J.S., utilizing the J.S.

Phone#1, called RIVERA and said, "I need to see you." RIVERA told J.S. to meet him

at "JUNGO's [ANGEL GARCIA's] house." RIVERA called J.S. back at approximately

5:44 p.m. and said he was on his way. The GPS tracker on the RIVERA Chrysler 300

indicated that RIVERA traveled to 337 Grand Avenue, or GARCIA's house, shortly

thereafter. Law enforcement believes that when J.S. said, "I need to see you," he was

telling RIVERA that he needed a supply of cocaine. It is law enforcement's experience

that a steady customer will call his or her supplier and make arrangements to meet via a

short conversation or text. The amount to be supplied is often understood. RIVERA

and J.S. agreed to meet at "JUNGO's house," where RIVERA would supply him with an

unknown amount of cocaine. The GPS tracker data corroborates the conclusion that they met at 337 Grand Avenue, or "JUNGO's house." It also showed a familiarity between J.S. and GARCIA ("JUNGO"), corroborating the FBI CI's information that J.S. and GARCIA are criminally associated.

114.    On January 25, 2014, at approximately 2:18 p.m., J.S., utilizing the J.S. Phone#1, called RIVERA and told RIVERA that he "just started cooking." RIVERA said he would be there in five minutes. During the conversation, the banging of pots can be heard in the background. It is law enforcement's belief that when J.S. said that he was "cooking," he meant he was cooking powder cocaine into crack cocaine. This is corroborated by the FBI CI's allegation that J.S. sold mostly crack cocaine. Law enforcement established surveillance at 417 Pfeiffer Street. Law enforcement observed the J.S. Blazer pull up to 417 Pfeiffer Street. At approximately 2:49 p.m., surveillance observed the RIVERA Chrysler 300 pull up and park in front of 417 Pfeiffer Street. RIVERA exited the RIVERA Chrysler 300 and entered the residence. RIVERA came back out approximately five minutes later and departed. Law enforcement believes that J.S. was "cooking" powder cocaine into crack cocaine and was resupplied powder cocaine by RIVERA which J.S. subsequently cooked into more crack cocaine.

115.    On February 14, 2014, at approximately 5:47 p.m., RIVERA received an incoming call from (856) 366-8836 (the J.S. Phone#2). The caller said, "I will be home in ten minutes." RIVERA said, "Nah, you're going to have to meet me at my mom's

house." At approximately 6:10 p.m., the Liberty Street pole camera captured the RIVERA Chrysler 300 driving up Liberty Street and parking in front of 1225 Liberty Street. At approximately 6:13 p.m., the pole camera captured a dark-colored SUV with New Jersey registration S12-CLT, believed to be the J.S. Blazer, driving up Liberty Street and parking just before the RIVERA Chrysler 300. The passenger exited the J.S. Blazer, walked over to the RIVERA Chrysler 300 and met with someone, then returned. Based on a voice comparison, law enforcement believes that the caller utilizing the J.S. Phone#2 was the same person who was previously utilizing the J.S. Phone#1. Because of the darkness, the figures could not be identified with the pole camera; however, law enforcement believes that it was J.S. who was in the J.S. Blazer, that J.S. met with RIVERA by the RIVERA Chrysler 300, that J.S. was supplied by RIVERA with an unknown amount of cocaine, and that J.S. then departed.

## ANGEL VELEZ:

116. Based on the phone analysis, monitoring of the wire intercepts, and physical and electronic surveillance, law enforcement believes that from December 5, 2013, to February 21, 2014, EFRAIM RIVERA supplied VELEZ with at least sixteen ounces of powder cocaine in addition to four ounces of crack cocaine. There were at least 410 contacts between RIVERA and cellular telephone facility number (267) 650-7635, a phone that law enforcement concluded was being utilized by VELEZ ("the VELEZ Phone"). Law enforcement identified VELEZ through the wire intercepts in

82

conjunction with surveillance. As previously stated in this Affidavit, VELEZ referred to CDS quantities in different text messages, as "7 done," "14 done," "I need an O"(ounce), and "u have any naked."

117. On January 7, 2014, there was a series of calls between RIVERA and the VELEZ Phone. At approximately 3:16 p.m., the VELEZ Phone sent the text, "Size 7 done up." At approximately 3:19 p.m., the RIVERA Phone replied, "K where u at?" The VELEZ Phone replied, "23rd." Then, at approximately 4:05 p.m., RIVERA called the VELEZ Phone and asked, "Where you at?" A male voice later identified as VELEZ replied, "Down the street from the car wash." Surveillance observed RIVERA drive up North 23rd Street and park on the 100 block. Surveillance then observed a male of physical stature to VELEZ, and believed to be VELEZ, exit 120 North 23rd Street. Law enforcement believes that VELEZ ordered seven grams of crack cocaine ("Size 7 done up") and then asked RIVERA to bring it to him on 23rd Street. Public records checks confirmed that VELEZ is associated with 120 North 23rd Street and that there is a car wash less than two blocks away at 23rd and Federal Streets.

118. On January 17, 2014, law enforcement surveillance observed the RIVERA Chrysler 300 parked in the Ablett Village apartment complex in Camden and observed an Hispanic male, later identified as VELEZ, exit the vehicle and enter 290 Ablett Village. Public records checks revealed that VELEZ is associated with 290 Ablett

83

Village. A photograph of VELEZ was identified by the surveillance unit as the individual

who exited the RIVERA Chrysler 300 and entered 290 Ablett Village.

119. An NCIC database check revealed that VELEZ has the following

convictions in the State of New Jersey:

> i. Arrested on November 22, 1999, by the Camden City Police
> Department and charged with possession of CDS;
> manufacture/distribution of CDS and CDS on school property.
> VELEZ was convicted of CDS on school property, a 3rd degree
> felony. On May 5, 2000, VELEZ was sentenced to three years'
> confinement, and was parole ineligible for one year.

> ii. Arrested on May 21, 2003, by the Camden City Police
> Department and charged with possession of CDS and CDS on
> school property. VELEZ was convicted of resisting arrest, a 3rd
> degree felony; and possession of CDS, a 3rd degree felony. On
> September 19, 2003, VELEZ was sentenced to 270 days'
> incarceration and three years' probation.

> iii. Arrested on January 23, 2009, by the Camden City Police
> Department and charged with criminal attempt; possession of
> CDS; manufacture/distribution of CDS. VELEZ was convicted of
> distribution of heroin/cocaine, a 3rd degree felony. On June 1,
> 2010, VELEZ was sentenced to five years' probation.

> iv. Arrested on July 10, 2009, by the Camden City Police
> Department and charged with possession of CDS;
> manufacturing/distribution of CDS; and CDS on school property.
> VELEZ was convicted of CDS on school property, a 3rd degree
> felony. On June 1, 2010, VELEZ was sentenced in the aggregate
> to five years' probation

120. The following are a few examples of the illicit relationship between

RIVERA and VELEZ:

121.    On January 9, 2014, at approximately 5:18 p.m., the VELEZ Phone sent the RIVERA Phone the text, "Yo cuzz . . any nake." At approximately 5:24 p.m., the RIVERA Phone sent the reply, "Yea." At approximately 5:25 p.m., the VELEZ Phone sent, "Need an o." Based on this communication, law enforcement believes that VELEZ was asking RIVERA for an ounce of powder (naked) cocaine.

122.    At approximately 6:42 p.m., RIVERA called VELEZ and asked, "Yo, where you at?" VELEZ said he was getting gas. RIVERA told VELEZ to meet him at his, "…auntie Aurea's house." VELEZ replied, "Oh, I'll meet you over there, then." Law enforcement knows that Aurea Garcia is GARCIA's mother. Law enforcement has observed a 2003 silver Buick Regal with New Jersey registration H22-CCE, parked in front of 337 Grand Avenue. Surveillance has observed GARCIA in this vehicle at different times, as well as an older Hispanic female, who was observed on several occasions driving this vehicle. An inquiry with New Jersey DMV determined that the vehicle is registered to Aurea Rivera, 337 A Grand Avenue, Camden. Law enforcement believes that RIVERA was referring to 337 Grand Avenue when he directed VELEZ to meet at "auntie Aurea's house." Law enforcement established surveillance of 337 Grand Avenue.

123.    At approximately 7:10 p.m., RIVERA called VELEZ and said, "I'm outside, homie." VELEZ responded, "Oh, alright. Here I come." A moment before this call, surveillance observed the RIVERA Chrysler 300 parked in front of 337 Grand Avenue.

Surveillance then observed a male figure with similar physical characteristics to VELEZ exit from 337 Grand Avenue then enter the passenger seat of the RIVERA Chrysler 300.   The male then exited the RIVERA Chrysler 300 and enter a dark-colored SUV. Surveillance was not in a position to positively identify VELEZ at this time, or record the license plate of the SUV.  The SUV pulled off and headed north on Grand Avenue, heading in the direction of Federal Street (towards North 23rd Street).

124.   On January 17, 2014, at approximately 2:35 p.m., VELEZ called RIVERA. RIVERA asked what VELEZ needed.  VELEZ responded, "nah, smooth, two 28," then repeated, "Two O's."  An ounce of cocaine is 28 grams; therefore, "two 28" is the equivalent of two "O's," or ounces.  At approximately 2:43 p.m., the VELEZ Phone sent a text to the RIVERA Phone, "Come to my crib an bring me a size 7 too."  Law enforcement interpreted this to mean that VELEZ wanted a total of 2.25 ounces of powder cocaine, as 7 grams equals approximately a quarter of an ounce.

125.   At approximately 3:17 p.m., the VELEZ Phone sent the text, "How long cuzz."  The RIVERA Phone sent the reply, "3mins."  Surveillance followed the RIVERA Chrysler 300 to the Ablett Village apartment complex at State Street and River Road, Camden.  Surveillance was unable to follow RIVERA into the complex.  At approximately 3:21 p.m., RIVERA called VELEZ and said, "Yo, I'm right here, outside." After a brief moment, surveillance was able to reacquire sight of the RIVERA Chrysler

300 and observed an Hispanic male, subsequently identified by the surveillance team as VELEZ, exit from the RIVERA Chrysler 300 and enter 290 Ablett Village.

126.    Also on January 17, law enforcement directed CW2 to contact RIVERA and arrange to purchase 2.5 ounces of powder cocaine. In summary, at approximately 4:31 p.m., which was more than an hour after the above observations at 290 Ablett Village, RIVERA met with CW2 in the Pathmark parking lot, where RIVERA sold CW2 approximately 2.25 ounces of powder cocaine for $2,700 (a quarter-ounce short of the requested amount).    When CW2 met with law enforcement, the suspected cocaine was weighed on a digital scale and was approximately seven grams short of 2.5 ounces.

127.    At approximately 4:54 p.m., before CW2 had the chance to call RIVERA back to complain, RIVERA sent the text, "Dam homie wrong one that one only 62. my bad. u still ard." CW2 sent a reply text, "I know just put it on da scale. Just put dat on da next one." The RIVERA Phone sent the reply, "K." Law enforcement interpreted this exchange as RIVERA realizing that he had given CW2 an order of 2.25 ounces of cocaine meant for VELEZ and had inadvertently switched CW2's order of 2.5 ounces of cocaine with VELEZ's previously described order.    RIVERA agreed to add the difference to the next CDS order placed with RIVERA. "62" refers to 62 grams of cocaine.  2.5 ounces of cocaine is supposed to equal approximately 70 grams, as there are approximately 28 grams in an ounce. It is law enforcement's experience that amounts often may vary by one or two grams. Often this depends on whether the seller

87

accounts for the weight of the bag containing the cocaine. Narcotics dealers normally count the bag as anywhere between .6 grams to 1 gram. 62 grams most likely means 2.25 ounces (63 grams, minus the 1 gram for the bag).

**M.R.**:

128. Based on the phone analysis, monitoring of the wire intercepts, and physical and electronic surveillance, law enforcement has determined that from December 5, 2013 through February 21, 2014, EFRAIM RIVERA supplied M.R. with at least four ounces of cocaine, consisting of some powder and some crack cocaine. There were at least 174 contacts between RIVERA and (856) 952-7898, a phone subscribed to M.R., 144 North 35th Street, Camden, and believed to be utilized by M.R. ("the M.R. Phone"). Law enforcement was able to identify at least twelve instances where RIVERA met with M.R. to supply him with cocaine. Public records checks confirmed that M.R. resides or resided at 144 North 35th Street, Camden. On February 25, 2014, M.R. called RIVERA and said, "just grab me one of them jawns." The two agreed to meet later at the Exxon gas station on Admiral Wilson Boulevard. Law enforcement surveillance responded and observed RIVERA meeting with a black Buick Lacrosse, New Jersey registration D68-DYA. A surveillance unit passed the Buick Lacrosse as it approached RIVERA's vehicle and positively identified M.R. as the lone occupant of the Lacrosse, who went on to meet with RIVERA.

88

129.    An NCIC records check revealed that M.R. has the following criminal history in the state of New Jersey:

> i. Arrested on May 5, 2011, by the Camden City Police Department and charged with murder; possession of a firearm for an unlawful purpose; and possession of a handgun. M.R. was convicted of aggravated assault with a weapon, a 4th degree felony. On August 22, 2012, M.R. was sentenced to eighteen months' confinement with no parole.

130.    Based on law enforcement's experienced interpretation of the intercepted communications, law enforcement believes that RIVERA supplied M.R. with quarter-ounce quantities, up to two ounces. For example, on January 5, 2014, the M.R. Phone sent the RIVERA Phone the text, "wat u say for the step up again?"  The RIVERA Phone replied, "550."  Law enforcement believes that M.R. wanted the price of a half-ounce of crack cocaine, as opposed to the normal quarter-ounce quantity.  $550 is consistent with the going street price for half an ounce of crack cocaine.

131.    M.R. sought a half-ounce of crack cocaine again in a call on January 17, 2014 when he asked RIVERA, "What you gonna do for me for three, yo?"  RIVERA replied he only had two but would check.   Law enforcement believes that M.R. was referring to three quarter-ounce quantities of most likely crack cocaine.

132.    Then on February 8, 2014, RIVERA called M.R. and M.R. asked for "one" and to "see if it come a little bit, um, know what I mean, a little hard, like chunky and shit."  Law enforcement believes that M.R. was referring to a quarter-ounce or more likely a full ounce of "hard," or crack cocaine.

**DANIEL ALSTON, aka BOO:**

133. Based on the phone analysis, monitoring of the wire intercepts, and physical and electronic surveillance, law enforcement has determined that from December 5, 2013, to February 21, 2014, EFRAIM RIVERA supplied ALSTON at least 40 ounces of cocaine. It is believed that the majority of the cocaine supplied was powder cocaine. There were at least 427 contacts between RIVERA and cellular telephone facility number (856) 952-6772, a phone law enforcement concluded was being utilized by ALSTON ("the ALSTON Phone"). Furthermore, RIVERA appears to front ALSTON cocaine. There are several conversations where RIVERA and ALSTON argue over the amount of money ALSTON owes for cocaine.

134. On January 26, 2014, ALSTON told RIVERA over the phone, "Well, I was gonna give you the, uh, just give you that $400 real quick 'cause I gotta couple people calling me and I need to make a couple dollars real quick, like fuck it." Law enforcement believes that ALSTON owed RIVERA $400 from a previous supply of cocaine, and that he wanted to pay RIVERA what he owed, and then get a new supply, because ALSTON had customers lined up. According to law enforcement, a drug dealer often fronts a supply of cocaine to regular or trusted customers with the understanding that the amount owed is due when the next supply of CDS is requested.

135. According to phone records, the subscriber of the ALSTON Phone is ALSTON, 716 North 7th Street, Camden. In a phone conversation with RIVERA,

ALSTON told RIVERA that his mother resides on 7th Street, near State Street,
consistent with the subscriber address. Public records checks indicate that ALSTON is
associated with an address in Camden, as well as in Lindenwold, New Jersey.
According to information received from local law enforcement, ALSTON is a well-known
narcotics distributor in Lindenwold. On December 11, 2013, there were a series of calls
and text messages between ALSTON and RIVERA, where ALSTON agreed to meet
RIVERA at 1225 Liberty Street. The Liberty Street pole camera captured ALSTON
arriving in a blue Honda CRV, New Jersey registration V51-AST, drive up Liberty Street
and park across from 1225 Liberty Street. A check with the New Jersey DMV revealed
that this vehicle is registered to the address in Lindenwold that ALSTON is associated
with. In addition, this is the address listed with the cellular phone company for the
ALSTON Phone.

136.    On January 26, 2014, based on a series of intercepted communications
where it was clearly evident to law enforcement that RIVERA was supplying cocaine to
ALSTON. Surveillance followed RIVERA to 809 East Elm Avenue and observed
RIVERA go up to the apartment described above as ALSTON's residence. ALSTON is
known to law enforcement to be referred to by the nickname "BOO." As previously
detailed in this Affidavit, on March 2, 2014, one of ALSTON's criminal associates called
RIVERA and referred to himself as "BOO's peoples."

91

137.    An NCIC records check revealed that ALSTON has the following criminal

history in the state of New Jersey:

> i.    Arrested on April 29, 1999 by the Lindenwold Police Department and charged with resisting arrest; attempt to elude police; distribution of heroin/cocaine and possession of CDS. ALSTON was convicted of attempting to elude police, a 3rd degree felony, and manufacturing/distributing CDS, a 3rd degree felony. ALSTON was originally sentenced on July 16, 1999 to 180 days' confinement and three years' probation. ALSTON's probation was subsequently revoked and ALSTON was sentenced on August 5, 2005 to three years' confinement.

> ii.   Arrested on January 22, 2001 by the Camden County Sheriff's Department and charged with terroristic threats; possession of a weapon for an unlawful purpose; aggravated assault with a weapon; possession of a handgun; and criminal trespass. ALSTON was convicted of threatening to commit a crime, a 3rd degree felony. ALSTON was sentenced in the aggregate on August 5, 2005 to three years' confinement.

> iii.  Arrested on July 7, 2002 by the Laurel Springs Police Department, and charged with CDS on school property and unlawful possession of a weapon.   ALSTON was convicted of those charges. On August 5, 2005, ALSTON was sentenced in the aggregate to seven years' confinement, with a parole ineligible term of three years.

> iv.   Arrested on February 21, 2003 by the Lindenwold Police Department, and charged with and then convicted of distribution of heroin/cocaine, a 3rd degree felony.  ALSTON was sentenced in the aggregate on August 5, 2005 to three years' confinement, with a parole ineligible term of three years.

> v.    Arrested on May 2, 2003 by the New Jersey State Police and charged with possession of marijuana/hash and manufacturing/distributing CDS. ALSTON was convicted of distributing LSD, a 2nd degree felony.   On August 5, 2005, ALSTON was sentenced in the aggregate to five years' confinement, with a parole ineligible term of three years.

92

> vi. Arrested on August 3, 2003 by the Stratford Police Department, and charged with aggravated assault; assault on police; resisting arrest and possession of a handgun. ALSTON was convicted of possession of a handgun, a 3rd degree felony. On August 5, 2005, ALSTON was sentenced in the aggregate to five years' confinement, with a parole ineligible term of two years.
>
> vii. Arrested on October 1, 2003 by the Lindenwold Police Department and charged with and then convicted of resisting arrest, a 3rd degree felony. On August 5, 2005, ALSTON was sentenced in the aggregate to five years' confinement.

138. Based on your affiant's training and experience and law enforcement's experienced interpretation of the intercepted communications, it is believed that EFRAIM RIVERA supplies ALSTON with quarter-ounce up to 4.5-ounce quantities of cocaine, most likely powder. For example, on December 11, 2013, the ALSTON Phone sent the text, "2 got 5." This most likely equates to two quarter-ounce quantities at a cost of $250 per ounce, in other words that ALSTON had $500 to spend for two quarter-ounces. As previously provided, ALSTON brokered a drug transaction with RIVERA on March 2, 2014, for 4.5 ounces of powder cocaine wherein ALSTON asked, "Hey, um, I need to make that, uh, New York trip, you heard . . . to take that ride up to hundred and twenty fifth." ALSTON said it was for his "peoples." RIVERA said, "you gonna bring that, you know what I mean, COD with you, right . . .I'm saying, you gonna have the paper already with you, though, right?" Law enforcement believes that ALSTON was ordering 125 grams or approximately 4.5 ounces of powder cocaine, for an unknown criminal associate. Additionally, RIVERA stated that he wanted to make sure that ALSTON was going to have the "Cash On Delivery."

93

139.    On February 8, 2014, ALSTON called RIVERA to complain about the
cocaine RIVERA supplied him. ALSTON said, "That shit bankrupted me, man."
RIVERA responded by saying, "you probably fucked it up and it was all thick" and "you
probably did something with that water." ALSTON said that "I been doing this shit too
long to do a fuckup like that." RIVERA responded that saying nobody else complained
and they "got the same shit." Based on the above-described conversation, law
enforcement believes that RIVERA supplied ALSTON with powder cocaine, and when
ALSTON, who has been "doing this shit too long to do a fuckup like that," cooked the
powder cocaine, the resulting crack cocaine was unsatisfactory.

## DYMIERE DEMBY:

140.    Based on the phone analysis, monitoring of the wire intercepts, and
physical and electronic surveillance, law enforcement believes that from December 5,
2013, to February 21, 2014, EFRAIM RIVERA supplied DEMBY over 90 ounces of
powder cocaine. Based upon investigation conducted by law enforcement, your affiant
believes that DEMBY supplies drug sets in the vicinity of 10th and Warsaw Streets,
Camden. There were at least 182 contacts between RIVERA and cellular telephone
facility numbers believed to be utilized by DEMBY:

> a. (702) 245-0676, from December 6 through December 7, 2013 (DEMBY
>    Phone#1);
>
> b. (267) 320-0423, from December 10, 2013 through January 5, 2014
>    (DEMBY Phone#2);

   c.  (856) 916-8621, from January 11 through January 18, 2014 (DEMBY
       Phone#3); and

   d.  (609) 271-3322, from January 28 through February 5, 2014 (DEMBY
       Phone#4).

141.   As noted above, DEMBY changed his cellular telephone number often,
which, based on your affiant's training and experience, is indicative of drug trafficking
and an attempt to evade detection by law enforcement. Law enforcement was able to
conclude that each phone was being utilized by DEMBY based on the timing of the last
call of the previous phone to the next call of the new phone, voice identification, the
similar content of the calls and texts, but most significantly, by the vehicles DEMBY
utilized.

142.   On December 13, 2013, at approximately 3:59 p.m., DEMBY called
RIVERA and said that he needed "a quick one right quick." At approximately 4:27 p.m.,
DEMBY called again and said, "It's me right here." At this time, the Liberty Street pole
camera captured a newer black Dodge Charger pull up and park near 1225 Liberty
Street. A surveillance unit was able to record the tag as temporary New Jersey
registration H262070. A check with the New Jersey DMV revealed that the temporary
tag was registered to a 2014 black Dodge Charger ("the DEMBY Charger") and owned
by S.D. (with the same last name as DEMBY), with an address in Atco, New Jersey.
On a subsequent occasion law enforcement observed DEMBY pull up in a 2011 Dodge
Durango with New Jersey registration P72-DCL during a meeting. A check with the
DMV indicated that the Durango was registered to an address in Sewell, New Jersey.

Public records checks determined that DEMBY was associated with both addresses. Physical surveillance routinely located the Charger and the Durango in the driveway of 453 Chapel Heights Road, Sewell.

143.    On January 11, 2014, at approximately 12:54 p.m., DEMBY called RIVERA and asked for "just one." RIVERA replied, "Alright, meet me at the spot in like fifteen minutes." At approximately 1:38 p.m., the Liberty Street Pole camera captured RIVERA walking from the RIVERA Chrysler 300 that was parked in front of 1225 Liberty Street, across to the DEMBY Charger parked across the street. After a brief moment, RIVERA walked back to the RIVERA Chrysler 300. The DEMBY Charger then departed. Law enforcement maintained constant surveillance on the DEMBY Charger until a marked Camden County Metro Police Department vehicle conducted a traffic stop for identification purposes a few blocks away. The lone occupant was identified as DEMBY with a DOB of January 11, 1991.

144.    As previously stated, on most of the occasions that DEMBY placed a cocaine order with EFRAIM RIVERA, RIVERA traveled to Philadelphia and met with UCC1. For example, as previously described above in this Affidavit, on December 7, 2013, at approximately 9:50 a.m., RIVERA received a call from DEMBY. DEMBY asked, "Yo bro, what's the deal?" RIVERA replied, "Shit dude, woke up about twenty minutes, so my nigga, I'll be ready for you." At approximately 10:02 a.m., RIVERA called UCC1. UCC1 said, "I gotta meet up with them in a few, so I'll let you know."

96

There were a series of calls and texts between RIVERA and DEMBY in which DEMBY was asking how long it was going to be. At approximately 12:14 p.m., UCC1 called RIVERA. RIVERA said, "Tell me some good news my nigga." UCC1 said, "I got some news, but I didn't get it yet." RIVERA asked, "For sure, you know how long, because my man been waiting like and I don't want to keep stalling, you know like that day, that man, you know, your boy had me." UCC1 said it would most likely be after 3:00 p.m.

145. At approximately 4:06 p.m., the UCC1 Phone#1 sent the RIVERA Phone the text, "We good." At approximately 4:21 p.m., the UCC1 Phone#1 sent the RIVERA Phone the text, "How many." The RIVERA Phone sent the reply, "2nd." Almost immediately after this text, RIVERA called DEMBY and asked, "what you was trying to do?" DEMBY replied, "Two."

146. At approximately 4:32 p.m., the DEMBY Phone sent the RIVERA Phone the text, "3." Almost immediately after this text, RIVERA called UCC1. RIVERA said, "Yo, my people said make it Third Street instead." Shortly after this call, surveillance attempted to follow the RIVERA Chrysler 300, but lost the vehicle in the vicinity of Front and Emerald streets in Philadelphia. As previously stated in this Affidavit, based on the above, law enforcement believes that RIVERA went to Philadelphia and was supplied at least three 4.5-ounce quantities of powder cocaine (total of 13.5 ounces), then returned to Camden.

97

147.   At approximately 5:12 p.m., the Liberty Street pole camera captured the
RIVERA Chrysler 300 return and park at 1225 Liberty Street. At approximately 5:18
p.m., RIVERA called DEMBY and said, "I'm here, bro." At approximately 5:27 p.m.,
DEMBY called RIVERA. RIVERA said, "I'm coming outside now." A few seconds later,
an SUV drove up Liberty Street and parked directly across from 1225 Liberty Street. A
male figure believed to be RIVERA exited 1225 Liberty Street and walked to the SUV.
Approximately two minutes later, RIVERA walked back across the street and the SUV
departed.   Law enforcement believes that RIVERA returned to 1225 Liberty Street and
had DEMBY meet him. RIVERA then supplied DEMBY with the "3," or 13.5 ounces of
powder cocaine.

148.   At approximately 6:04 p.m., DEMBY called RIVERA. DEMBY said, "Shit, I
just ate one of them sandwiches, man, that shit was kinda light." RIVERA asked, "Kinda
light? Like, what was it looking like?" DEMBY replied, "Like, like, 102." RIVERA said,
"Wooo, are you sure they doin' it right, homey?" DEMBY replied, "Yeah, I want to do
that shit right in front of you, so you can, know what I mean, know what's going on."
Law enforcement believes that DEMBY cooked one of the 4.5-ounce quantities of
powder cocaine into crack cocaine and that it lost approximately 24 grams in net weight
during the cooking process.

149.   At approximately 6:13 p.m., RIVERA called UCC1. RIVERA asked, "I got
a question bro, did they check that before they motherfucking gave it to you?" UCC1

said, "Nah, I just grabbed it, got it, you know what I mean."  RIVERA said, "Cuz my
man's, they don't never give me complaints, and he just called me back."   Based on the
above circumstances, law enforcement believes that RIVERA called UCC1 to complain
that his customer was not satisfied.

### GIOVANNI CARRERO:

150.    Based on the phone analysis, monitoring of the wire intercepts, and
physical and electronic surveillance, law enforcement believes that from December 5,
2013, to February 21, 2014, EFRAIM RIVERA supplied CARRERO over 24 ounces of
powder cocaine, and over six ounces of crack cocaine.  The quantities supplied varied
from a quarter-ounce of crack cocaine to nine ounces of powder cocaine.  There were
approximately 271 contacts and at least thirteen meetings between the two.  CARRERO
utilized the following cellular telephone facility numbers:

   a. (856) 870-5592, from December 8, 2013 through February 10, 2014
      ("the CARRERO Phone#1"); and

   b. (856) 575-7080, from February 14 through March 2, 2014 ("the
      CARRERO Phone#2).

151.    Law enforcement concluded that CARRERO operated both phones based
on the timing of the last call on CARRERO Phone#1 and the first call on CARRERO
Phone#2, voice identification (most calls were in Spanish), and the vehicles used by
CARRERO when meeting with RIVERA.   In addition, there were occasions where the
Liberty Street pole camera was able to capture a clear enough picture to conclude that it

was CARRERO meeting with RIVERA.  Also, as described below in more detail, law

enforcement stopped and identified CARRERO after CARRERO met with RIVERA.

152.    An NCIC records check revealed that CARRERO has the following

criminal history in the state of New Jersey:

      i.    Arrested on February 27, 1999, by the Camden City Police
Department, and charged with possession of CDS; CDS on
school property; and manufacturing/distributing CDS.  CARRERO
was convicted of distribution of heroin/cocaine, a 3rd degree
felony.  On May 12, 2000, CARRERO was sentenced to four
years' confinement.

     ii.    Arrested on October 20, 2003, by the Camden City Police
Department, and charged with possession of CDS; CDS on
school property; and manufacturing/distributing CDS.  CARRERO
was convicted of distribution of heroin/cocaine, a 3rd degree
felony.  On May 21, 2004, CARRERO was sentenced to 3 years'
probation.  This probation was subsequently revoked and
CARRERO was resentenced in the aggregate on November 30,
2006 to four years' confinement.

    iii.    Arrested on February 23, 2005, by the Camden City Police
Department and charged with possession of CDS; CDS on school
property; and manufacturing/distributing CDS.  CARRERO was
convicted of possession of CDS or analog, a 3rd degree felony.
On November 30, 2006, CARRERO was sentenced in the
aggregate to 4 years' confinement.

    iv.    Arrested on June 14, 2006, by the by the Camden City Police
Department and charged with possession of CDS and
manufacturing/distributing CDS.  CARRERO was convicted of
distribution of heroin/cocaine, a 3rd degree felony.  On November
30, 2006, CARRERO was sentenced in the aggregate to 4 years'
confinement with a parole ineligible term of 18 months.

    v.    Arrested on January 26, 2009, by the Camden City Police
Department and charged with criminal attempt and
possession/use of CDS.  CARRERO was convicted of distribution
of heroin/cocaine, a 3rd degree felony.  On October 23, 2009,

> CARRERO was sentenced in the aggregate to 4 years'
> confinement with a parole ineligible term of 2 years.

vi.   Arrested on April 28, 2009, by the Camden City Police
Department and charged with threaten to kill; possession/use of
CDS; and manufacturing/distributing CDS. CARRERO was
convicted of distribution of heroin/cocaine, a 3rd degree felony.
On October 23, 2009, CARRERO was sentenced in the
aggregate to 4 years' confinement with a parole ineligible term of
2 years.

vii.  Arrested on January 11, 2012, by the Camden City Police
Department and charged with possession/use of CDS.
CARRERO was convicted of distribution of heroin/cocaine, a 3rd
degree felony. On August 8, 2012, CARRERO was sentenced in
the aggregate to 5 years' probation.

153.   On January 25, 2014, at approximately 3:30 p.m., CARRERO called

RIVERA and asked, "do you have cases to sell?" and "without being put together?"

RIVERA said yes. CARRERO then said, "I need to get something also." As previously

stated, during the investigation, CARRERO used the terms "cases," "bikes," and "cars"

in several calls with RIVERA, which law enforcement believes were code for amounts of

cocaine. In this case, law enforcement believes that CARRERO was asking for at least

an ounce of cocaine "without being put together," meaning powder cocaine. This

amount was most likely for a customer, as CARRERO indicated to RIVERA that he also

needed a quantity for himself.

154.   At approximately 3:40 p.m., CARRERO called RIVERA and said, "I'm

going to need, that is a, a, that crystal that cost 550, right?" and "the one that, and that

101

glue, the little profile, that costs 275." Law enforcement believes that CARRERO called back with the amounts of what he needed. $550 and $275 are consistent with the street prices of half-ounce and quarter-ounce quantities of crack cocaine, respectively.

155. At approximately 4:40 p.m., RIVERA called CARRERO and asked, "Do you have your, that thing of yours with you?" and "the little gadget . . . the one that you always have with you to check the tires" and "I think mine got wet and it's screwing." CARRERO replied that he had one at home. Law enforcement believes that RIVERA needed to borrow CARRERO's digital scale. It is known to law enforcement that narcotic dealers use digital scales to determine quantities when breaking down CDS into resale quantities.

156. At approximately 4:55 p.m., CARRERO called RIVERA and said that he was there. At about this time, the Liberty Street pole camera captured a silver 2001 Dodge Caravan with New Jersey registration M81-BTY, parking a few doors down from 1225 Liberty Street. This vehicle has been observed numerous times parking on Liberty Street in conjunction with meetings with RIVERA. A New Jersey DMV check determined that the vehicle is registered to E.C., 567 Spruce Street, Camden. Law enforcement spot checks have also observed the Caravan parked at 567 Spruce Street. RIVERA walked up to the van's passenger side, then proceeded into 1225 Liberty Street. A few minutes later, RIVERA exited the residence and entered his Chrysler 300. The passenger of the Caravan, later identified as CARRERO, exited the Caravan and

entered the passenger seat of the RIVERA Chrysler 300.  The Chrysler 300 circled the block and returned to 1225 Liberty Street.  CARRERO exited the RIVERA Chrysler 300 and got back into the Caravan.  Surveillance observed the Caravan for several blocks and then a marked Camden County Metro Police Department vehicle conducted a traffic stop for identification purposes.  E.C. was identified as the driver and CARRERO the passenger of the Caravan.  Following the stop the vehicle was allowed to continue on its way.

157.  To summarize, law enforcement believes that CARRERO placed an order with EFRAIM RIVERA for a "case" (unspecified amount of powder cocaine), a half-ounce of crack cocaine, and a quarter-ounce of crack cocaine.  CARRERO intended to resell the "case" to one of his customers.  RIVERA and CARRERO arranged to meet at 1225 Liberty Street.  RIVERA asked CARRERO to bring a scale so that he could break down the requested amounts.  When CARRERO arrived, RIVERA received the scale and entered his house to weigh out the requested amounts.  RIVERA emerged and RIVERA and CARRERO made the exchange in the RIVERA Chrysler 300.  CARRERO then departed in the Caravan and was positively identified by law enforcement.

158.  As previously described in this Affidavit, on January 26, 2014, at approximately 12:59 p.m., the RIVERA Phone sent the UCC1 Phone#2 a text, "Can u get second for me."  At approximately 1:34 p.m., the UCC1 Phone#2 sent the response,

103

"Im calln 4u." As previously explained in this Affidavit, law enforcement believes that RIVERA ordered nine ounces of cocaine from UCC1 on January 26, 2014.

159.   At approximately 1:24 p.m., CARRERO called RIVERA.  CARRERO said, "Yo. I am going to need one of those, you hear?" RIVERA told CARRERO that he was waiting on his supplier, telling CARRERO, "Alright. I'm waiting...I'm w-waiting for the guy to bring it to me now." Law enforcement believes that CARRERO was asking for 4.5 ounces of cocaine when he said, "I am going to need one of those." RIVERA then told CARRERO that he was waiting, meaning that he was waiting for his supply from UCC1.

160.   At approximately 2:25 p.m., UCC1 called RIVERA.  UCC1 said, "Yo, if you want, you can meet me at the garage." RIVERA replied, "Alright then I'm a head up there now." The call ended shortly thereafter.

161.   At approximately 2:38 p.m., the RIVERA Phone sent the text to the CARRERO Phone, "He cumin I need 4650." The CARRERO Phone sent the response, "can I get something." The RIVERA Phone sent the text, "50 the price goin up." At approximately 2:42 p.m., CARRERO called RIVERA.  CARRERO said, "Uh, I'm going over there right now, yo. I talked to the guy. He said it was fine. They need it, so . . ." RIVERA said, "Yeah, 'cause, I mean, there's, right now I'm going to keep a hundred. All of this is going up right now so be prepared, for your guys that you're dealing with, they'll tell you the same thing." CARRERO asked, "That, what happened?" RIVERA

said, "No, that, prices are going up." CARRERO replied, "Yes, I know. I already told all of them, so . . ." CARRERO asked, "How much do you want me to give you?" RIVERA replied, "Then, pay me 46 now." Law enforcement believes that CARRERO was obtaining the money from an unknown customer and that once RIVERA supplied him (CARRERO) with the 4.5-ounce quantity of cocaine, CARRERO was going to resell it to an unknown customer, while making a profit for himself.

162. At approximately 2:49 p.m., UCC1 called RIVERA. UCC1 said, "Yo my nigga, I had to muscle I had to muscle my jawn. I got them. I got both of them for you, you hear." RIVERA responded, "My nigga. I'm on the way over there right now." UCC1 said, "Alright, alright, I'm going to wait for you next to the jawn." The data from the GPS tracker on the RIVERA Chrysler 300 indicated that the RIVERA Chrysler 300 crossed the Ben Franklin Bridge into Philadelphia, drove to the vicinity of Front and Girard Streets, and returned. It is law enforcement's belief that UCC1 supplied RIVERA with at least nine ounces of cocaine based on the statement from UCC1 that he had both of them, meaning two 4.5-ounce quantities.

163. At approximately 3:32 p.m., RIVERA called the CARRERO Phone, and said, "Yo. In ten minutes, go to my mom's house." At approximately 4:05 p.m., the CARRERO Phone called the RIVERA Phone. RIVERA answered, "I'm here on the corner." CARRERO asked, "Where, bastard?" RIVERA replied, "You're in the middle of the street right there?" CARRERO replied, "Yeah, yeah." RIVERA said, "That's me

105

coming down the street." At this time, the Liberty Street pole camera captured a male in a brown or neutral-colored hooded sweatshirt walking down Liberty Street as the RIVERA Chrysler 300 pulled up to 1225 Liberty Street. This figure entered the passenger door of the RIVERA Chrysler 300. Law enforcement concluded that this figure was CARRERO. CARRERO exited RIVERA's car a minute later and walked back up Liberty Street out of view.

164.    At approximately 4:38 p.m., the CARRERO Phone sent a text to the RIVERA Phone, which read, "missing 4gr." At approximately 4:39 p.m., the CARRERO Phone followed up with another text, "121gr." Law enforcement believes that this confirms the premise that RIVERA supplied CARRERO with cocaine, but that it was short of the expected 4.5 ounces or close to 126 grams.

165.    As previously stated in this Affidavit, on February 17, 2014, at approximately 6:48 p.m., RIVERA called CARRERO. CARRERO asked, "you working?" RIVERA replied, "No, I'm about to go to work right now, why?" CARRERO said, "I need, I need a motorcycle, brother…the one that costs four six…" and asked, "Let me see, uh, in y our house or your mom house?" RIVERA said, "no, my house." At approximately 6:51 p.m., CARRERO called RIVERA and said, "I'm on my way there." Law enforcement believes that CARRERO ordered a 4.5-ounce quantity of cocaine which he referred to as a "motorcycle" that cost $4,600. CARRERO again retrieved the money from an unknown customer and met RIVERA. Although not in a position to

106

observe the meeting, law enforcement believes that CARRERO met RIVERA at 3069 Stevens Street as opposed to 1225 Liberty Street, known as RIVERA's mother's house, to make the exchange.

## K.R.

166.    Based on the phone analysis, monitoring of the wire intercepts, and physical and electronic surveillance, law enforcement believes that from December 5, 2013 through February 21, 2014, EFRAIM RIVERA supplied K.R. with over 2.75 ounces of crack and/or powder cocaine.   There were at least 65 contacts between RIVERA and cellular telephone facility number (215) 678-6031, subscribed to 1552 Park Boulevard, Camden, and believed to be utilized by K.R. ("the K.R. Phone").  Law enforcement was able to identify at least nine instances where RIVERA met with K.R., usually at 1552 Park Boulevard, to supply him with cocaine. Public records checks indicated that K.R., DOB June 9, 1985, is associated with 1552 Park Boulevard.

167.    On December 13, 2013, K.R. called RIVERA , identified himself and asked if RIVERA was "going to be around later?" On January 6, 2014, at approximately 3:07 p.m., K.R. called RIVERA and said, "I need you" and "meet me on Park Boulevard."   At approximately 4:33 p.m., RIVERA called K.R. and asked, "where I'm pulling up, bro?" K.R. responded, "Right across from Magnolia Apartments, 1552.  I'm coming out now." Surveillance was established in the area and observed RIVERA meeting with a young, taller black male matching the description of K.R.

168.    An NCIC records check revealed that K.R. has the following criminal

history in the state of New Jersey:

> i.    Arrested on April 3, 2007, by the Camden City Police Department and charged with resisting arrest; attempting to elude police; manufacturing/distributing CDS; and CDS on school property. K.R. was convicted of CDS on school property, a 3rd degree felony.  On October 19, 2007, K.R. was sentenced to three years' confinement.
>
> ii.    Arrested on May 17, 2007, by the Camden City Police Department and charged with manufacturing/distributing CDS and CDS on school property.  K.R. was convicted of CDS on school property, a 3rd degree felony.  On October 19, 2007, K.R. was sentenced in the aggregate to three years' confinement.
>
> iii.    Arrested on February 28, 2012, by the Camden City Police Department and charged with escape.  K.R. was convicted of escape, a 3rd degree felony.  On March 1, 2013, K.R. was sentenced to four years' probation.

167.    On December 30, 2013, at approximately 2:57 p.m., K.R. called RIVERA

and said, "Yo bro, I need you" and "I got two for you."  RIVERA directed K.R. to "come

straight to my mom house, I be there."   At approximately 3:53 p.m., the Liberty Street

Pole camera captured a black Nissan Altima driving up Liberty Street.  The Altima

parked across from 1225 Liberty Street.  At about the same time, K.R. called RIVERA.

RIVERA said, "I'm coming outside, now."  RIVERA was captured exiting 1225 Liberty

Street and entering a white 2014 Toyota Camry with Tennessee registration M72-88Y.

Earlier in the day, and on December 29, 2013, RIVERA was observed operating this

vehicle, which is a Hertz rental vehicle.   A taller black male, matching the physical

appearance of K.R. and believed to be K.R., crossed the street from the Altima and

108

entered the passenger seat of the Toyota. After about a minute, K.R. exited the Toyota, returned to the black Altima, and departed.

168.    On January 18, 2014, at approximately 3:15 p.m., K.R. called RIVERA and said, "I was twenty away and shit. I didn't want you to go nowhere, but I know I was going to need you later. Yeah, I had 180, but . . ." RIVERA said he would be around. Law enforcement believes that K.R. was asking to see RIVERA later, most likely to purchase a quarter-ounce of powder cocaine, for which K.R. would pay $200. $200 is consistent with street-level prices for a quarter-ounce of powder cocaine.

169.    On February 26, at approximately 8:37 a.m., the K.R. Phone sent the RIVERA Phone the text "need 1." At approximately 2:13 p.m., RIVERA called K.R. K.R. said, "I'm here on Park Boulevard." RIVERA said that he would be "like twenty minutes." At approximately 4:00 p.m., the Liberty Street Pole camera captured RIVERA entering the RIVERA Chrysler 300 and pulling off. Data from the GPS tracker indicated that the RIVERA Chrysler 300 traveled to the vicinity of 1552 Park Boulevard, where it remained stationary for approximately two minutes. Law enforcement believes that RIVERA met with K.R. and supplied him a minimum of seven grams of cocaine.

170.    On March 2, 2014, at approximately 3:56 p.m., the K.R. Phone sent the RIVERA Phone the text, "need 1." The RIVERA Phone replied, "K" and "Where u at"? The K.R. Phone replied, "Park blvd I don't got da car". At approximately 5:21 p.m., RIVERA called K.R. and said, "come out side, yo." Law enforcement believes that in

109

both of the above cases, "need 1" most likely refers to the same amount, that is, a quarter-ounce of either powder or crack cocaine. As mentioned above, there were at least nine similar instances where K.R. met with RIVERA and was supplied at least a quarter-ounce of cocaine.

## DEWAYNE JACKSON:

171. Based on the phone analysis, monitoring of the wire intercepts, and physical and electronic surveillance, law enforcement believes that from December 5, 2013, up to February 21, 2014, EFRAIM RIVERA supplied JACKSON with bundles[31] of cocaine, each bundle most likely consisting of twelve to thirteen ten-dollar bags of powder cocaine. A ten-dollar bag of cocaine generally contains approximately 0.14 grams of powder cocaine. Based on the investigation, law enforcement conservatively estimated that RIVERA provided JACKSON with at least ten bundles per week, which would equate to approximately 168 grams total, or six ounces of powder cocaine (1 bundle of 12 = 1.68 grams per bundle at 10 bundles per week = 16.8 grams/week for 10 weeks = 168 grams total). There were approximately 617 contacts between RIVERA and JACKSON, and at least twenty meetings. JACKSON routinely came to 1225 Liberty Street whenever RIVERA asked him to. He either walked up, or drove up in a

---

[31] A "bundle," a common street term, refers to anywhere from ten to fifteen individual bags of user amounts of CDS that are normally strapped together by a rubber band. The bundles are given to the street-level narcotics trafficker, referred to as the "trapper." The trapper then usually breaks up the bundles and sells individual bags to drug users.

110

blue 2003 Ford Explorer, New Jersey registration F96-ARB. Based on the

conversations and texts and other investigation, law enforcement believes that

JACKSON sold to street-level drug users, including in the area of Green and Mechanic

Streets, Camden; the Ivy Hill apartments at Pershing and Chase Streets, Camden; a

customer of RIVERA in Gloucester City, G.G.; and stashes cocaine in his Explorer.

JACKSON utilized cellular telephone facility number (609) 933-4385 ("the JACKSON

Phone"). The phone is subscribed to L. JACKSON, 1258 Mechanic Street, Camden. A

check with New Jersey DMV revealed that New Jersey registration F96-ARB is owned

by L. JACKSON, 1258 Mechanic Street, Camden.  Public records checks indicated that

DEWAYNE JACKSON was associated with this address and with L. JACKSON.  A

photograph of DEWAYNE JACKSON was obtained and he was positively identified

from pole camera footage.  In addition, a marked Camden County Metro Police

Department unit conducted a traffic stop of the Explorer and identified JACKSON as the

driver.  An NCIC records check revealed that JACKSON has the following criminal

history in the state of New Jersey:

> i. Arrested on March 1, 1992, by the Newark Police Department, and charged with robbery; carrying a prohibited weapon; and possession of a weapon. JACKSON was convicted of robbery, a 2nd degree felony. On September 24, 1993, JACKSON was sentenced to seven years' confinement.
>
> ii. Arrested on February 8, 2004, by the Newark Police Department, and charged with aggravated assault; possession of a weapon; and endangering the welfare of a child. JACKSON was convicted of endangering the welfare of a child, a 3rd degree felony. On June 25, 2004, JACKSON was sentenced to two years' probation.

111

iii.   Arrested on October 26, 2007, by the Monroe Township Police Department, and charged with assault and hindering apprehension. JACKSON was convicted of aggravated assault with bodily injury. On September 26, 2008, JACKSON was sentenced to one year of probation.

iv.   Arrested on April 14, 2012, by the Woodbury Police Department, and charged with assault on police. JACKSON was convicted of resisting arrest, a 3rd degree felony. The sentence is pending.

172.   On December 6, 2013, at approximately 1:29 p.m., JACKSON called RIVERA. RIVERA said, "I'm about to walk outside now." JACKSON said, "No, no, wait. My stupid ass, I had the jawns back with the, ah, the money. I started to walk right by the truck" and "I'm going to get the money. The jawns are in the mailbox" and "I walked past the truck. I had the jawns in the back there." Law enforcement believes that JACKSON was selling cocaine for RIVERA and after his shift and returned the unsold bundles of cocaine and put them in the mail box of 1225 Liberty Street. JACKSON returned to his Explorer because he forgot the proceeds that he owed to RIVERA from the days' sales.

173.   On December 20, 2013, RIVERA called JACKSON and said, "Meet me at my mom's house right now." At approximately 2:57 p.m., the Liberty Street pole camera captured the RIVERA Chrysler 300 driving up Liberty Street. The RIVERA Chrysler 300 parked across the street from 1225 Liberty. RIVERA walked across the street and opened the chain-linked gate to the side driveway. RIVERA came back out and entered the passenger seat of JACKSON's Explorer. After about a minute, RIVERA exited JACKSON's Explorer and walked across to the RIVERA Chrysler 300.

112

A minute after that, JACKSON exited the driver's door and opened the back hatch. He appeared to be stuffing something into the left side of the trunk compartment. Law enforcement believes that RIVERA directed JACKSON to meet him at 1225 Liberty Street. RIVERA supplied JACKSON, then JACKSON hid the bundles in the back compartment of his vehicle.

174. On January 27, 2014, at approximately 4:25 p.m., an older-sounding unknown male ("UM2") utilizing telephone facility number (856) 412-2199 ("the UM2 Phone") called RIVERA and asked, "Can I get two nice ones?" RIVERA said he would call him back. At approximately 4:56 p.m., RIVERA called JACKSON and told him to "go to my mom's house. See the old man. He's sitting right there...just two." At 6:57 p.m., RIVERA called JACKSON. RIVERA was upset. He said, "They said you gave up some light ones...they been touched, bro, like you know what I mean. Like, yah mean, like I hope, come on man" and "don't need nobody else calling me like that no more bro. I give 'em to you right so it shouldn't be no complaints." Law enforcement believes that UM2 called RIVERA for either two bags or two bundles. RIVERA had directed JACKSON to meet UM2 and supply him the requested amounts. At some point, UM2 complained to RIVERA that the bags were light, meaning, not containing as much product as usual. RIVERA then called JACKSON and accused him of stealing from the bags of cocaine.

175. On February 8, 2014, at approximately 5:50 p.m., RIVERA received a call from (856) 831-8591, a phone known to be utilized by G.G. ("the G.G. Phone"). G.G.

113

asked, "can you stop by a little bit later?" RIVERA asked what he needed. G.G. said, "I'm not sure yet. I got to go pick up the money." RIVERA said to "just call me." G.G. said, "Alright, well don't send them dudes around, 'cause I didn't like the last couple times they came around." RIVERA asked, "What happened, it was small?" G.G. replied, "Ah, the first time, well the first time... you know I mean I ain't complaining? First time you sent them around they were two short and then they came back with, I told them I wanted four more and they was really beat, and then last time they came by they was small and a little beat too, you know what I mean."

176. At approximately 6:49 p.m., RIVERA received a call from JACKSON. RIVERA scolded JACKSON, saying "You all niggers, you all nigger been giving my man some bullshit man," and "Like come on. I don't know what you been doing, whatever you be doing dog, but I'm not a dumb nigger, know what I'm saying, and I hate, I hate motherfuckers keep complaining about shit. Know what I'm saying? That's all man" and "I went, I went and paid for it out of my money." Additionally, there were two previous occasions where G.G. called RIVERA and RIVERA directed JACKSON to make the deliveries. Law enforcement believes that G.G. was dissatisfied with the cocaine that JACKSON delivered on behalf of RIVERA. He complained to RIVERA, and RIVERA confronted JACKSON regarding the complaints.

## **THE SHERIDAN STREET DTO INVESTIGATION**

114

177.   Through the RIVERA DTO Investigation, as well as during the earlier Sheridan Street Investigation, law enforcement learned that RAYMOND ROLDAN and ANT RAMOS supply cocaine in the Pollacktown section of Camden, and in particular, through an open air drug set in front of 1185 Sheridan Street.  They each have their own arms of the overall Sheridan Street DTO conspiracy (i.e., the "RAYMOND ROLDAN DTO" and "RAMOS DTO," respectively) to distribute their cocaine; however, they help each other out, distribute in the same area, share workers and suppliers, and use the same locations to cook or process powder cocaine into crack cocaine (for example, 1350 Sheridan Street, 1550 Mount Ephraim Avenue).    Moreover, when RAMOS' regular cocaine supplier is unavailable, RAMOS will go to ROLDAN, and vice-versa.

## ROLDAN DTO

## LEADER:

## RAYMOND ROLDAN

178.   As detailed above, law enforcement learned that RAYMOND ROLDAN supplies significant quantities of crack cocaine in the Camden area. As previously stated, the investigation identified two cellular phone numbers that RAYMOND ROLDAN utilized to facilitate his drug trafficking activities during the investigation:  (856) 308-1601 and (856) 916-7072 ("the RAYMOND ROLDAN Phone#2").  As addressed above in Footnote 2, law enforcement identified (856) 308-1601 as a number being utilized by RAYMOND ROLDAN and initiated a court-authorized interception on January

16, 2014.   On February 21, 2014, while monitoring the wire intercepts of the ANT

RAMOS Phone, law enforcement captured a call from the ROLDAN Phone#2 to ANT

RAMOS.   Law enforcement immediately recognized the voice as ROLDAN's.

Furthermore, during a controlled buy on February 22, 2014, ROLDAN provided his

cellular number to CW4 as (856) 916-7072.   Details of the February 22, 2014 controlled

purchase are discussed below in this Affidavit.

179.   An NCIC database search reveals that RAYMOND ROLDAN has the

following criminal history in the State of New Jersey:

> i.   Arrested on January 29, 1994 by the Camden City Police
> Department, and charged with possession of CDS or analog;
> distribution/possession with the intent to distribute CDS on school
> property; possession/distribution of imitation CDS; and distribution
> of heroin/cocaine.   RAYMOND ROLDAN pled guilty to
> distribution/possession with the intent to distribute CDS on school
> property, a 3rd degree felony.   On April 3, 1998, RAYMOND
> ROLDAN was sentenced to five years' confinement.
>
> ii.   Arrested on February 14, 1994 by the Camden City Police
> Department, and charged with possession of a weapon for an
> unlawful purpose; unlawful possession of a weapon; aggravated
> assault; and aggravated assault with a weapon.   RAYMOND
> ROLDAN pled guilty to the charge of aggravated assault, a 2nd
> degree felony.   On April 3, 1998, RAYMOND ROLDAN was
> sentenced in the aggregate to seven years' confinement and was
> parole ineligible for three years and six months.

180.   RAYMOND ROLDAN utilized the phone to facilitate his DTO.   Based on

physical surveillance, the monitoring of pole cameras, controlled purchases of crack

cocaine, source information, and law enforcement experience, your affiant believes that

116

ROLDAN distributes mostly ounce quantities of crack cocaine in the Pollacktown and Whitman Park sections of Camden.

181.   At a minimum, from January 16 through March 24, 2014, the RAYMOND ROLDAN DTO has, by conservative estimates, distributed over two kilograms of crack cocaine.   ROLDAN supplies RIVERA with ounce quantities of crack cocaine upon request.   ROLDAN resides at 1355 Sheridan Street, Camden.  His cousin and close associate, ANT RAMOS, resides across the street from ROLDAN at 1350 Sheridan Street, but will also stay at 1185 Sheridan Street.   ROLDAN has a few different sources of supply for his powder cocaine.  These sources include, but are not limited to, RAMOS, D.S., sometimes EFRAIM RIVERA, and LUIS DIAZ.  Law enforcement believes that ROLDAN uses 1350 Sheridan Street (ANT RAMOS' house) to cook the powder himself, or more than likely, has ANT RAMOS cook it for him.   ROLDAN will also use the apartment of his relative, RAMON DIAZ, 1550 Mount Ephraim Avenue, Camden (the apartment is actually on the 1100 block of Morton Street, but has a Mount Ephraim Avenue address).  Law enforcement believes, based on the intercepts of ROLDAN and ANTHONY ESPRIT's cellular telephone communications, and in conjunction with the Sheridan Street pole cameras, that on several occasions, ROLDAN was supplied powder cocaine, and then met with RAMOS at 1350 Sheridan Street to process or cook the powder cocaine into crack cocaine.  ROLDAN uses his sister, DAISY ROLDAN, and his nephew, ESPRIT (who is DAISY ROLDAN's son), to distribute the crack cocaine and collect money.    During the course of this investigation,

117

law enforcement learned that ESPRIT was utilizing telephone facility number (856) 575-7119 ("the ESPRIT Phone"). The evidence obtained through the court–authorized interception of this phone line establishes that RAYMOND ROLDAN utilizes ESPRIT and DAISY ROLDAN handle the day-to-day operations of his DTO.

182.    RAYMOND ROLDAN's "facilitators" or main "lieutenants" are DAISY ROLDAN and ESPRIT. RAYMOND ROLDAN's customers include, but are not limited to EFRAIM RIVERA and "J.H.," who he supplies directly, as well as R.C. and M.M., who are supplied through ESPRIT.

## RAMOS DTO

### LEADER:

### ANTHONY RAMOS, aka ANT

183.    As detailed above, it is believed based on this investigation that ANT RAMOS supplies a significant amount of crack cocaine and heroin in the Camden area. An NCIC database search reveals that ANT RAMOS has the following criminal history in the State of New Jersey:

> i.    Arrested January 3, 2008, by the Camden City Police Department, and charged with receiving stolen property and unlawful possession of a weapon. RAMOS was convicted of unlawful disposition of weapons, a 4th degree felony. On August 27, 2009, RAMOS was sentenced to 5 years' probation.
>
> ii.   Arrested on May 5, 2008, by the Camden City Police Department, and charged with possession/use of CDS and manufacturing/distributing CDS. RAMOS was convicted of

118

> possession of CDS or analog, a 3rd degree felony. On August 27, 2009, RAMOS was sentenced in the aggregate to 5 years' probation.
>
> iii.    Arrested on May 9, 2011, by the Camden City Police Department, and charged with eluding. RAMOS was convicted of resisting arrest, a 3rd degree felony. On April 20, 2012, RAMOS was sentenced to 4 years' probation.

184.    It is also believed based on this investigation that RAMOS utilized cellular telephone facility number (856) 831-5157 ("the RAMOS Phone") to facilitate his DTO. RAMOS used mostly family members to facilitate, protect and expand his DTO: RAMOS normally stays at his grandmother's house at 1185 Sheridan Street, but often can be found at his mother's house at 1350 Sheridan Street, as well. Law enforcement has learned that RAMOS breaks down his cocaine and heroin, and cooks the cocaine at different locations, including, but not limited to RAMON DIAZ' apartment at 1550 Mount Ephraim Avenue; 1350 Sheridan Street; 7721 Broad Street, Apartment D, Pennsauken, New Jersey; and on at least one occasion, room 101 at the Inn of the Dove, 725 Cuthbert Boulevard, Cherry Hill, New Jersey. It is believed based on this investigation that the RAMOS DTO stashes CDS and/or proceeds primarily at 1350 Sheridan, 1225 Sheridan Street (JIMMY MERCADO residence), and/or 1185 Sheridan Street. He obtains powder cocaine from different suppliers including, but not limited to, D.S., RIVERA, CARRERO (from the RIVERA DTO), and LUIS DIAZ. ANT RAMOS also sells heroin. The suspected heroin supplier(s) are not addressed in this Affidavit. ANT RAMOS' closest associates are GIO RAMOS, AL RAMOS, and JIMMY MERCADO. He also uses RAMON DIAZ and R.H. to assist in the operation of the DTO.

119

185.    As part of the Sheridan Street Investigation, ANT RAMOS, AL RAMOS, GIO RAMOS, and JIMMY MERCADO were arrested on October 3, 2012 inside of 1350 Sheridan Street.  Recovered from 1350 Sheridan Street and ANT RAMOS' vehicle parked outside, were four handguns (one gun was located in the vehicle); approximately two ounces of suspected phencyclidine ("PCP"); approximately 292 decks[32] of heroin (279 stamped "bike life" and 13 stamped "paperboy"); approximately 3.5 ounces of suspected crack cocaine; 2.5 ounces of suspected powder cocaine (vehicle); approximately half a pound of marijuana; and $6,221.   The majority of the suspected CDS was found in the kitchen of the residence, much of it on the kitchen table, or otherwise out in the open.  It is your affiant's conclusion that the occupants were in the process of cooking and/or bagging the cocaine for further resale when they were arrested.

186.    The RAMOS DTO customers include, but are not limited to WASHINGTON, T.N., ERIC RIVERA, and R.H.  RAMOS has a lot of his crack cocaine and heroin distributed at the open-air drug set in front of his grandmother's house at 1185 Sheridan Street.

## CONTROLLED PURCHASES FROM
## RAYMOND ROLDAN, ANT RAMOS, and ESPRIT

---

[32]    A "deck" of heroin is commonly used to describe a plastic bag containing a piece of wax-like paper that contains the suspected heroin.  The paper is usually stamped with a picture and/or words that are used as a sort of brand name.

120

### February 15, 2014 controlled purchase:

187.   On February 15, 2014, a cooperating witness (CW4)[33] was directed to proceed to 1185 Sheridan Street and purchase a quarter-ounce of crack cocaine from ANT RAMOS.   CW4 was monitored throughout the entire process by physical surveillance and pole cameras.   At approximately 4:42 p.m., surveillance observed CW4 passing 1350 Sheridan Street when ROCKY DIAZ, aka ROCKY, exited 1350 Sheridan Street.   CW4 and ROCKY DIAZ appeared to converse.   After a brief period, CW4 went up the steps leading to 1350 Sheridan Street.

188.   At approximately 4:44 p.m., CW4 came back out and was monitored back to the pre-designated meeting location.   Law enforcement met with CW4 and recovered a plastic bag containing an off-white chunky substance of suspected crack cocaine, and the recording device, which was then de-activated.   Law enforcement subsequently field-tested the substance, which reacted positive indicating the presence of cocaine. CW4 was debriefed and advised that, as CW4 was passing 1350 Sheridan Street, ROCKY DIAZ exited that address.   CW4 asked if he had any heroin, and DIAZ directed him to ANT RAMOS.   CW4 went up to the door of 1350 Sheridan Street.   ANT RAMOS and GIO RAMOS  came to the door.   CW4 asked for a quarter-ounce of crack cocaine.

---

[33]      CW4 began providing information to law enforcement in late 2013.  CW4 was arrested several times in the State of New Jersey:  in 2004, and was convicted of possession of CDS, a 3rd degree felony; in 2004 again, and was convicted of distribution of CDS, a 2nd degree felony; in 2013, and was convicted of possession of a handgun, a 2nd degree felony.  Information provided by CW4 has been proven reliable and has been corroborated by law enforcement.

ANT RAMOS told GIO RAMOS to get it for CW4. GIO RAMOS handed CW4 the crack. ANT RAMOS told GIO RAMOS to give it to CW4 for $200. CW4 gave GIO RAMOS the $200. ANT RAMOS told CW4 that he also had good heroin for sale. He said the price was $85 per gram, or $90 for a bundle of fifteen bags of heroin. A review of the recording corroborated CW4's account. CW4 advised that ANT RAMOS uses the stamp "JUICY" for his heroin. CW4 did not buy heroin at this time.

189. As previously mentioned in this Affidavit, in the early morning hours of February 16, 2014, Camden County Metro Police executed a consent search of 1350 Sheridan Street in conjunction with a local shooting investigation. Police recovered over 486 plastic bags of suspected heroin from the kitchen and $6,900 from the bedroom of L. RAMOS. The bags of suspected heroin were stamped with the word "Juicy XL." GIO RAMOS was taken into custody as a result by the Camden County Metro Police. According to police reports, GIO RAMOS admitted in a post-Miranda interview that he attempted to hide the heroin when police started knocking at the front door.

### February 22, 2014 controlled purchase:

190. On February 22, 2014, CW4 was directed to go to 1185 Sheridan Street to purchase ten grams of heroin. CW4 was monitored throughout the process by physical surveillance and pole cameras. At approximately 2:26 p.m., surveillance observed CW4 arriving in the vicinity of 1185 Sheridan Street. There were at least two males loitering in front. At approximately the same time, a blue Dodge Durango with New Jersey registration S26-CTS and known to be operated by RAYMOND ROLDAN ("the